UNITED STATES of America, Plaintiff-Appellee,

v.

Walter A. HEXT, Sr., et al., Defendants, Harlingen Compress Company et al., Defendants-Appellants.

No. 29003.

United States Court of Appeals, Fifth Circuit.

June 25, 1971.

Edward R. Finck, Jr., San Antonio, Tex., Nile E. Ball, Darrell B. Hester, Hester & Toscano, Bonner & Ball, Harlingen, Tex., for defendants-appellants.

Rollins M. Koppel, Carter, Stiernberg, Skaggs & Koppel, Harlingen, Tex., for Marshall & Marshall.

Frank C. Brooks, Brooks, Montgomery & Matthews, Dallas, Tex., for amicus curiae Southwestern Compress & Warehouse Assn.

Anthony J. P. Farris, U. S. Atty., Houston, Tex., Alan S. Rosenthal, Alexander P. Humphrey, Attys., Dept. of Justice, Civ. Div., Washington, D. C., James R. Gough, Frank C. Cooksey, Asst. U. S. Attys., Houston, Tex., William D. Ruckelshaus, Asst. Atty. Gen., Wahington, D. C., for plaintiff-appellee.

Before COLEMAN, INGRAHAM and WILKEY,* Circuit Judges.

WILKEY, Circuit Judge:

The United States brought suit under the jurisdictional grant of 28 U.S.C. § 1345 alleging conversion of 578 bales of cotton in which it held a security interest. Named as defendants were Walter A. Hext, Sr. (Hext), the grower of the cotton, the W. A. Hext & Sons Gin Co., Inc. (the Gin Co.), a corporation wholly owned by Hext which ginned and marketed the cotton, Harlingen Compress Co. (Harlingen), a warehouse company which stored the cotton, and Marshall & Marshall (Marshall), a cotton brokerage firm through whom the cotton was marketed. A default judgment was entered against Hext and the Gin Co., both of whom were insolvent. After trial to the court, the District Judge, based on stipulated facts,

* Of the District of Columbia Circuit, sitting by designation.

depositions, and oral testimony, found Harlingen and Marshall liable to the United States and entered judgment against them in the amount of $15,650.-13, plus interest, from which Harlingen and Marshall appeal. For reasons hereinafter stated we reverse the judgment of the trial court.

## I. *The Facts*

The Farmers Home Administration (FHA) is an agency of the United States Department of Agriculture which, among other things, engages in the financing of farming operations as authorized by the Bankhead-Jones Farm Tenant Act.[1] In 1961–62 the FHA loaned Walter A. Hext, a cotton farmer, a total of $38,720.00 to finance his farming operations for 1962. In order to provide security for the loan, Hext granted a chattel mortgage on his forthcoming cotton crop to the FHA. The mortgage was duly recorded.[2] Hext, as the FHA knew when it made the loan, in addition to being a cotton farmer, was also in the cotton ginning business as the sole owner of the W. A. Hext and Sons Gin Co., Inc. The FHA was aware when it financed Hext's cotton crop that, after harvesting, the cotton would be ginned and marketed by Hext through his own ginning company. The Gin Co., in addition to processing the cotton grown by Hext, also ginned and marketed cotton produced by a number of other farmers in the area.[3]

After ginning, the Gin Co. transported the cotton to the Harlingen Compress Co., where the cotton was compressed and stored. Harlingen issued negotiable warehouse receipts covering each bale of cotton received. These negotiable receipts were retained by the Gin Co.[4]

In order to market the cotton the Gin Co. contracted with Marshall & Marshall, known in the cotton trade as a "spot broker" or "selling agent." At the Gin Co.'s direction Harlingen sent Marshall samples cut from each bale of cotton warehoused. Marshall displayed these samples, received offers to purchase from buyers who inspected the samples, and transmitted the offers to the Gin Co. The Gin Co. then told Marshall that the offers were either accepted or rejected, and Marshall communicated this information to the buyers. If an offer were accepted, Marshall prepared an invoice and draft and sent them to the Gin Co. The Gin Co. then forwarded the invoice, draft, and the warehouse receipts covering the cotton sold through banking channels to the buyer. When the draft was honored by the buyer the purchase price was credited to the Gin Co.'s account at its bank. In due course the buyers presented Harlingen with the warehouse receipts and shipping instructions, with which Harlingen complied. Neither Harlingen nor Marshall had any actual knowledge of the FHA's security interest.

---

1. 7 U.S.C. § 1941 *et seq.*

2. Although, as we decide *infra*, federal law must govern the ultimate questions of the duties and liabilities of the parties in the instant litigation, the filing requirements for perfection of a security interest must nevertheless be those in effect in the particular state where the collateral is located. *See* United States v. Sommerville, 324 F.2d 712, 717 (3rd Cir. 1963). The parties to the instant case raise no claim that the Government's lien was not properly perfected.

3. The testimony indicates that the Gin Co. marketed in the neighborhood of 1900 bales of cotton in 1962, including the 578 bales grown by Hext.

4. According to stipulation of the parties, some of the warehouse receipts covering the 578 bales in question were made out in the name of "W. A. Hext" and some were merely issued to the gin in blank. The testimony indicates that whether or not the receipts bore the name of the individual farmer depended upon the evidently fortuitous circumstance of whether or not the truck manifest covering the cotton delivered to the warehouse indicated the name of the farmer from whom the gin had received the cotton. In any event, the warehouse always delivered the receipts to the Gin Co., which in accordance with trade practice retained them until the cotton was sold to a buyer.

As the Gin Co. received payment for the cotton from the buyers, it in turn paid the various farmers who had produced it[5]. In the case of the 578 bales of cotton grown by Hext himself, however, the money received for the cotton remained in the Gin Co. account. At the end of the season Hext was unable to make full payment on the loan, defaulting in the amount of $18,139.07.

With both Hext and the Gin Co. insolvent, the Government brought suit against Marshall, alleging that its actions as "selling agent" amounted to an exercise of dominion over the cotton in a manner inconsistent with the Government's security interest, thus constituting a conversion of the cotton. Marshall in turn filed a complaint naming Harlingen as a third-party defendant, and claiming a right of indemnity on any liability imposed. The ground for the cross-claim was that Harlingen had allegedly violated a 1913 Texas statute (Article 5571, Texas Revised Civil Statutes 1925) when it issued negotiable warehouse receipts covering the cotton without noting the existence of a lien thereon. The United States then amended its complaint to name Harlingen as a defendant, asserting liability both on the basis that Harlingen's actions amounted to a conversion of the cotton and on the claimed violation of Art. 5571. The trial court, without expressly deciding whether federal or Texas law applied to the transaction,[6] rendered judgment for the

United States against Harlingen and Marshall jointly on the conversion claim, and for Marshall against Harlingen on the cross-claim.

On this appeal both Marshall and Harlingen urge that the trial court erred in holding that the Government had not consented to the sale of the cotton, that the facts and circumstances demonstrated such consent, thus barring conversion liability.[7] Marshall also claims that the acts performed by it as "selling agent" did not amount to the exercise of sufficient dominion over the cotton to constitute a basis for conversion liability. Harlingen additionally asserts that application of Art. 5571 as a basis for its liability over to Marshall was erroneous and that that statute had been repealed by implication by the subsequent enactment of the Texas Uniform Warehouse Receipts Act. Because of the approach we take in the analysis set forth below, we find it unnecessary to pass on these issues.

## II. *Choice of Law*

Six Circuit Courts of Appeals have decided the issue of whether federal or state law controls in suits brought by the United States to enforce its rights under FHA farm mortgages. The Third, Sixth, Ninth, and Tenth Circuits have held that the rights and liabilities of the parties to such suits must be determined with reference to federal law.[8] The re-

---

5. Some of the farmers were paid for their cotton at the time it was delivered to the gin. In the case of most, however, payment was not effected until after the cotton was sold by the gin and the purchase price credited to the gin's account.

6. The Uniform Commercial Code was not adopted in Texas until 1966. Hence, if state law were to be applied to the instant case it would necessarily be the law of Texas in 1962 as it existed prior to the enactment of the Code.

7. Appellants rely on United States v. Hansen, 311 F.2d 477 (8th Cir. 1963), where the trial court had found as a fact that the FHA, through its county supervisor, had consented to the sale of the mortgaged property which amounted to the waiver of

the lien. The Circuit Court found that the trial judge was correct in concluding that the county supervisor had authority to waive the lien and affirmed the factual finding of consent to sale as not clearly erroneous. In the instant case, however, the trial judge decided the consent issue on Marshall's motion for summary judgment, based upon an agreed state of facts, thus necessarily deciding the question as a matter of law. As indicated *infra*, we find it unnecessary to consider the correctness of this ruling. It suffices to note that the record before us contains no evidence of any express consent being given.

8. Cassidy Commission Co. v. United States, 387 F.2d 875 (10th Cir. 1967); United States v. Carson, 372 F.2d 429 (6th Cir.

maining two courts, the Eighth and the Fourth Circuits, have held that state law controls.[9] In United States v. McCleskey Mills,[10] this court declined to decide the issue because it was presented in the context of a case where both state and federal law dictated the same result.

The merits of the choice of law question have been fully ventilated in the six Courts of Appeals decisions noted *supra.* It suffices to state here that the principal reason supporting the application of federal law is the need for a uniform rule of decision to govern the rights of the United States in the administration of a large-scale program, of nation-wide scope such as the FHA farm loan program, rather than subjecting "federal rights and duties to the exceptional uncertainty and heterogeneity" which might result "if disparate laws of individual states were applied to substantially identical loan transactions."[11]

While maintaining that appellants here, as in *McCleskey Mills, supra,* are liable under both state and federal law, the Government strongly urges us now to decide whether state or federal law provides the proper rule of decision. In the first place, the Government represents that, because the choice of law question has not been settled in this Circuit, litigation of claims of improper disposition of property covered by FHA security agreements, typically involving relatively small amounts, has persisted, with the Government asserting liability under a uniform federal rule, and the defendants resisting on the basis of a claimed exoneration under state law. Whereas in those circuits where the choice of law issue has been resolved, we are told that lower court litigation has virtually ceased. Secondly, it is urged that while the law of some states of this Circuit coincides with the federal rule, in others the state law is contrary to the federal rule.[12]

After careful consideration, we have determined that a uniform federal interpretation is required. This case itself provides an illustration of the vagaries to which the FHA loan program might be subjected if state law were to control. The District Court found that the FHA's perfected security interest, recorded at the Cameron County courthouse, was a sufficient basis for the imposition of conversion liability on both Marshall and Harlingen, even though both of these parties were without actual knowledge of the Government's lien. The trial court further held that Harlingen's failure to note the existence of the Government's lien on the warehouse receipts issued by it, as the court held was then required by Article 5571 of the Texas Revised Civil Statutes,

1967) ; United States v. Sommerville, 324 F.2d 712 (3rd Cir. 1963), cert. denied, 376 U.S. 909, 84 S.Ct. 663, 11 L.Ed.2d 608 (1964) ; United States v. Matthews, 244 F.2d 626 (9th Cir. 1957).

9. United States v. Union Livestock Sales Co., 298 F.2d 755 (4th Cir. 1962) ; United States v. Kramel, 234 F.2d 577 (8th Cir. 1956).

10. 409 F.2d 1216 (5th Cir. 1969) ; *accord,* DuVall-Wheeler Livestock Barn v. United States, 415 F.2d 226 (5th Cir. 1969).

11. United States v. Sommerville, 324 F.2d 712, 716, 717 (3rd Cir. 1963).

12. The Government suggests that Dixie Stock Yard, Inc. v. Ferguson, 192 Miss. 166, 4 So.2d 724 (1941), indicates that Mississippi law diverges from the rule applied by those courts which have chosen .

federal law to govern FHA secured transactions. Additionally, it is pointed out that since the instant case was tried Texas law pertaining to mortgaged cotton has been changed in a manner contrary to the federal rule. See the discussion of Art. 5571, Tex.Rev.Civ.Stat., *infra.* Similarly, subsequent to a District Court decision, affirmed by this court on appeal in DuVall-Wheeler Livestock Barn v. United States, 415 F.2d 226 (5th Cir. 1969), which imposed liability on auctioneers of FHA mortgaged livestock under both Georgia and federal law, the Georgia Commercial Code was amended to protect commission merchants dealing with livestock and other agricultural products without actual notice of a prior security interest, from liability to prior secured parties. *See* 30A Ga.Code Ann. §§ 109A–9–307(3) and (4) (Supp.1970).

rendered Harlingen liable for the Government's loss.[13] Apparently in response to this decision, the Texas Legislature in 1969 amended Article 5571 to provide as follows:

> *Cotton under lien.* No person, firm or corporation which subsequently buys, sells, or deals in any way with negotiable warehouse receipts issued by any public warehousemen to evidence cotton stored in a public warehouse or which subsequently buys, sells, or deals in any way with such cotton, shall be liable for conversion of said cotton because of the existence of any lien or encumbrance on said cotton in the absence of actual knowledge of such lien or encumbrance at the time of the claimed conversion.

This new statute is essentially contrary both to the general common law of conversion and to the principles governing security interests and documents of title under the Uniform Commercial Code. It is evident that the rights of the United States arising from the operation of the FHA loan program cannot realistically be subjected to the possibility that the governing law may be changed whenever the United States is successful in litigation in order to prevent such success in subsequent similar cases.

We therefore hold that the rights and liabilities of the parties to suits arising from FHA loan transactions must, under the rationale of the *Clearfield Trust* doctrine,[14] be determined with reference to federal law, to be fashioned by the federal courts according to general principles of commercial law.

### III. Determining the Applicable Federal Rule

Having decided that federal law must apply to the litigation at bar, we nevertheless see no reason nor necessity for fashioning a specialized, esoteric body of federal law, confined in terms to suits by the United States seeking to impose conversion liability on persons who deal with property mortgaged under the FHA loan program. An FHA loan is nothing more nor less than a secured transaction, with the United States as the secured party holding a security interest in property of the debtor in order to insure repayment of the loan. Although *Clearfield Trust* indicated that the federal Law Merchant, "developed for about a century under the regime of Swift v. Tyson" was "a convenient source of reference for fashioning federal rules applicable to these federal questions,"[15] it is evident that the prin-

---

13. Cf. Boshkoff, The Irregular Issuance of Warehouse Receipts and Article Seven of the Uniform Commercial Code, 65 Mich.L. Rev. 1361 (1967).

14. Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). The Court stated:

> In our choice of the applicable federal rule we have occasionally selected state law. * * * But reasons whch may make state law at times the appropriate federal rule are singularly inappropriate here. The issuance of commercial paper by the United States is on a vast scale and transactions in that paper from issuance to payment will commonly occur in several states. The application of state law, even without the conflict of laws rules of the forum, would subject the rights and duties of the United States to exceptional uncertainty. It would lead to great diversity in results

by making identical transactions subject to the vagaries of the laws of the several states. The desirability of a uniform federal rule is plain. And while the federal law merchant, developed for about a century under the regime of Swift v. Tyson, 16 Pet. 1, 10 L.Ed. 865, represented general commercial law rather than a choice of a federal rule designed to protect a federal right, it nevertheless stands as a convenient source of reference for fashioning federal rules applicable to these federal questions. (*Id.,* at 367, 63 S.Ct. at 575.)

15. *Id.,* at 367, 63 S.Ct. at 575. The question in *Clearfield Trust* was whether state or federal common law governs the rights of the parties in transactions involving commercial paper issued by the United States.

cipal fount of general commercial law governing secured transactions is now Article 9 of the Uniform Commercial Code.[16] We perceive no reason why the rights of the United States arising out of secured transactions pursuant to the FHA loan program should be any different than those of other financers of farming operations under the Uniform Commercial Code. We have therefore determined that in fashioning the federal law that is applicable to suits arising from the FHA loan program we shall be guided by the principles set forth in Article 9 and other relevant portions of the Uniform Commercial Code.[17]

Such a course meets the principal reason advanced for requiring a federal rule of decision in these cases, that of uniformity,[18] while at the same time assuring that an individual state's modifications of the Code's scheme cannot be employed to defeat federal rights.[19] Taking this step is not inconsistent with the prior decisions applying federal law to suits arising from the FHA program

16. *Cf.* New York, N. H. & H. R. Co. v. RFC, 180 F.2d 241, 244 (2d Cir. 1950), where Judge Learned Hand in a case arising from a transaction of the federal Reconstruction Finance Corporation looked to the uniform Negotiable Instruments Law, then enacted in every state, as a source of the federal common law governing the rights of the parties, stating that the NIL was "more complete and more certain, than any other which can conceivably be drawn from those sources of 'general law' to which we were accustomed to resort in the days of Swift v. Tyson."

17. In so doing we are merely exercising the traditional judicial technique of making "use of a statutory rule as a model for the creation of an analogous judicial rule" which has been so ably discussed by Justice Roger J. Traynor of the Supreme Court of California. *See* Traynor, Statutes Revolving in Common-Law Orbits, 17 Cath.U.L.Rev. 401, 420 (1968). As Justice Traynor noted:

> The Uniform Commercial Code has become a major influnece on the development of common law in the federal courts to govern cases involving government contracts and other commercial transactions. (*Id.*, at 422–23.)

*See* Transatlantic Fin. Corp. v. United States, 124 U.S.App.D.C. 183, 363 F.2d 312 (1966); United States v. Wegematic Corp., 360 F.2d 674 (2d Cir. 1966); United States v. First National Bank, 263 F.Supp. 298, 300–302 (D.Mass.1967). The Code has similarly been influential in suits between private parties arising under federal law. *See* In re Yale Express System, Inc., 370 F.2d 433, 437–438 (2d Cir. 1966) (bankruptcy); David Crystal, Inc. v. Cunard Steamship Co., 223 F.Supp. 273, 286–287 (S.D.N.Y.1963), aff'd, 339 F.2d 295 (2d Cir. 1964), cert. denied, 380 U.S. 976, 85 S.Ct. 1340, 14 L.Ed.2d 271 (1965) (admiralty). The Permanent Editorial Board for the Uniform Commercial Code has recently proposed extensive revisions in Article 9. See Final Report, Permanent Editorial Board for the Uniform Commercial Code, Proposals for Changes in Article 9 of the Uniform Commercial Code and Related Changes in Other Articles with Reasons Therefor and Comments (1971) [hereafter, "Final Report"]. However, none of the proposed changes are material to the issues involved in the instant case. Our references throughout this opinion are therefore to the language of the 1962 Official Edition, which insofar as pertinent here remains essentially unchanged in the 1971 version.

18. A second reason advanced for applying federal law in such situations is to assure the ability of the United States to protect the federal fisc. *See* United States v. Sommerville, 324 F.2d 712, 716 (3rd Cir. 1963). However, we do not perceive this to mean that the federal courts must fashion a rule under which the Government always wins. Rather, the thrust of this consideration is that federal rights should not be at the mercy of the power of any particular state court or legislature to change the applicable law.

19. As Judge Friendly has stated in a suit involving the contractual rights of the United States under federal common law:

> The [Uniform Commercial] Code * * is well on its way to becoming a truly national law of commerce. * * * When the states have gone so far in achieving the desirable goal of a uniform law governing commercial transactions, it would be a distinct disservice to insist on a different one for the segment of commerce, important but still small in relation to the total, consisting of transactions with the United States. (United States v. Wegematic Corp., 360 F.2d 674, 676 (2d Cir. 1966).)

since, in our judgment, in every case in which federal law has been so applied (see note 6, *supra*), the same result would have been reached under the Code.[20] The Code has now been adopted in every state save Louisiana. By evaluating the issues involved in suits concerning FHA secured transactions in light of Article 9, the federal courts will have a coherent, unified body of law with which to deal and can benefit from the general body of precedent developed by the state courts under the Code. This is not to say, of course, that the interpretation of the Code made by any particular state court will be controlling nor that any modification of the Code enacted by a particular state legislature need be followed. Such interpretations and modifications may be followed only if the federal courts deem them reflective of the weight of authority, consistent with the operation to the FHA program, or desirable as precedent.

On this basis it is our judgment that the Code itself and the general body of precedent developed by the Code states provide the most logical source material supplying the content of federal common law to govern suits arising from FHA secured transactions.[21] In this fashion the federal law governing FHA loans and the state law of secured transactions will coalesce to reinforce each other.

### IV. *The Code as Applied to the Instant Case*

Having determined to look to the Uniform Commercial Code as a source for fashioning federal law applicable to the rights of the parties in this case, we now proceed to examine the facts and circumstances surrounding the transactions here involved in light of the Code's provisions.

The record establishes that the custom and practice in the cotton trade in Texas[22] is for the individual cotton farmer to sell his cotton to a gin.[23] The

20. Similarly, in those cases where the Code has been applied to FHA transactions as a matter of state law, the result reached has been consistent with the position asserted by the Government in the cases which have resorted to federal common law. See DuVall-Wheeler Livestock Barn v. United States, 415 F.2d 226 (5th Cir. 1969); United States v. McCleskey Mills, 409 F.2d 1216 (5th Cir. 1969); United States v. Greenwich Mill & Elevator Co., 291 F.Supp. 609 (N.D.Ohio 1968).

21. It is true that the Code does not deal with the tort law of conversion which, under the Code scheme is essentially a remedy to be provided by other state law to one whose security interest has been violated. See Uniform Commercial Code § 9–306, Comment 3. Thus, in the fashioning of federal law, legal issues that may arise in respect of the tort doctrine of conversion must still be decided by federal courts with reference to general common law. However, in the context of secured transactions, the basis for conversion liability does not exist until the party seeking to impose liability has the right to immediate possession of the mortgaged chattel. And under the Code the secured party's right to immediate possession does not arise until there has been a default, for example, by an unauthorized transfer of collateral in violation of the security agreement. Uniform Commercial Code § 9–503. See United States v. Sommerville, 324 F.2d 712, 719 (3rd Cir. 1963) (concurring opinion). Therefore, under the view we adopt, it is necessary first to determine whether a valid Code security interest existed and whether a default, giving rise to a right of immediate possession has occurred, before any issues respecting the law of conversion need be explored.

22. United States v. Chickasha Cotton Oil Co., 115 F.2d 135 (10th Cir. 1940), describes trade practices then followed in Oklahoma in the marketing of cotton mortgaged to the Government, which are apparently quite similar to those generally in vogue in Texas at the time of the instant case.

23. The record is unclear as to the precise nature of the typical transaction between the farmer and the gin. Evidently the farmer is sometimes paid outright for his cotton at the time he delivers it to the gin. Perhaps more frequently, payment by the gin to the farmer is not made until after the cotton is marketed. The farmer may or may not be consulted as to the acceptability of a particular offer to buy the cotton. In any event, the farmers

gin in turn gins the cotton, arranges for storage pending sale, markets the cotton by placing samples with a selling agent, and sells the cotton to buyers who make offers to the gin after examining the samples. Warehousemen, selling agents and buyers all deal with the gin and not with the individual farmer, and indeed frequently do not even know the identity of the individual farmer who originally raised the cotton.[24] In the usual transaction the gin that deals with a farmer who has mortgaged his cotton to the FHA protects itself and satisfies the loan by issuing its checks in payment for the cotton jointly to the farmer and the FHA.[25]

As the trial judge astutely noted, the problem in the instant case arose because of the fact that Hext, the farmer to whom the FHA provided financing, also operated his own gin company, and rather than transferring payment received by the Gin Co. for the 578 bales of cotton raised by him individually to the Government at the time the cotton was sold, he simply waited until the end of the season and at that time paid the Government the amount then remaining in the Gin Co. account.[26] As related previously, the FHA knew when it loaned money to Hext that Hext operated a gin, and intended to gin his own cotton therein and market it just as he did the cotton received from other farmers, i. e., through the Gin Co.

Section 9–306(2) of the Uniform Commercial Code provides:

Except where this Article otherwise provides a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

The trial judge held as a matter of law that the Government's actions vis-a-vis Hext did not amount to consent to sale of the mortgaged cotton in the manner here accomplished. Appellants urge that this determination was error.[27] However,

apparently permit the gins to warehouse, market, and sell the cotton, and to keep possession of the negotiable warehouse receipts evidencing the cotton, pending sale. All parties appear to deal with the transaction between the farmer and the gin as a sale to the gin. Indeed, the Government in its complaint in the instant case alleged that Hext individually *sold* the cotton here in question to the Gin Co.

Similarly ambiguous transactions between producers and processors have been noted in other areas of agricultural commerce. See the discussion of "participation agreements" effected between growers and processors in the citrus fruit industry in Coogan and Mays, Crop Financing and Article 9: A Dialogue with Particular Emphasis on the Problems of Florida Citrus Crop Financing, 22 U. Miami L.Rev. 13, 49 (1967).

24. Each bale of cotton ginned is given a tag number by the gin. The warehousemen and others deal with the gin and identify the cotton by this tag number and by the warehouse receipt number given each bale by the warehouse. The gin appears to be the only party who has an accurate record of which bale comes from which farmer. There was testimony on behalf of Harlingen that it knew the name of the individual farmer only about 40% of the time, and then only because the truck manifest pursuant to which the cotton was delivered to the warehouse by the gin happened to list some farmers' names.

25. As a matter of practice, the FHA further protects its security by sending each season to the gins in the area a list of the farmers in whose crops it holds a security interest. As the trial judge observed, in the instant case this protection was of no value to the FHA because the cotton it financed on this occasion was raised by the gin operator himself.

26. At the hearing below, the trial judge observed:

That's the key to this whole case, the fact that Mr. Hext was not only a grower, but a ginner. He was ginning his own cotton, and he wasn't about to protect anybody but W. A. Hext. If he wasn't broke we wouldn't be here, because you would have gotten your money from him. Now, the government is trying to get somebody else.

27. See note 5, *supra*, and accompanying text.

assuming *arguendo* that the holding of no consent was correct, it is apparent that in terms of Section 9–306(2) the sale was not "authorized" by the secured party so as to terminate the security interest in the cotton. Thus, unless some other section of Article 9 "otherwise provides," the Government's security interest continued after the cotton was sold by the Gin Co.

Section 9–307(1) provides:

> A buyer in ordinary course of business (subsection (9) of Section 1–201) other than a person buying farm products from, a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.

Section 1–201(9) defines buyer in the ordinary course of business as follows:

> Buyer in ordinary course of business means a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business

of selling goods of that kind but does not include a pawnbroker * * *.

Under the Section 1–201 definition, it is clear that the Gin Co. was in the business of selling cotton and that the buyers of the cotton in question here were buyers in the ordinary course of business. Nor is there any doubt that ordinarily ginned cotton is in the category of "farm products" referred to by Section 9–307(1).[28] However, in order for the FHA's security interest to continue in the cotton by virtue of the exception from Section 9–307(1) pertaining to buyers of farm products, the farm products must be bought "from a person engaged in farming operations."[29]

In our view, the record establishes that the buyers of the cotton here involved bought from the Gin Co., and not from Hext himself. They did not therefore purchase from a person engaged in farming operations within the meaning of Section 9–307(1).[30] It is true that Hext himself as the grower of the cotton was engaged in farming operations, was at the same time the sole owner of the Gin Co., and for other

---

28. Section 9–109 of the Code defines farm products as follows:
   Goods are * * * "farm products" if they are crops or livestock or supplies used or produced in farming operations or if they are products of crops or livestock in their unmanufactured states (such as ginned cotton, wool-clip, maple syrup, milk and eggs), and if they are in the possession of a debtor engaged in raising, fattening, grazing or other farming operations. * * *

29. The exception from the effects of ordinary course buying under § 9–307(1) for persons who buy from farmers has been criticized as unwarranted on the ground that no reasonable basis exists for treating modern agricultural operations differently from other types of businesses. See Comment, "Farm Products" under the UCC—Is a Special Classification Desirable? 47 Texas L.Rev. 309 (1969); Coogan & Mays, Crop Financing and Article 9: A Dialogue with Particular Emphasis on the Problems of Florida Citrus Crop Financing, 22 U.Miami L. Rev. 13, 18–23 (1967); G. Gilmore, 2 Security Interests in Personal Property

§ 26.10, at 707, § 26.11, at 714 (1965). While there would appear to be considerable merit to the critics' position, no state has yet amended its Code to remove the Farm Products exemption from § 9–307(1). The preference generally given to agricultural financers is thus still universally accepted in the operation of the commercial law of secured transactions. The Review Committee for Article 9 of the Uniform Commercial Code has similarly questioned the soundness of the Farm Products exemption and recommended its removal from the Code as an optional amendment. The Permanent Editorial Board, however, deleted the Committee's recommendation. *See* Final Report, Appendix, at 208–209.

30. Indeed, the cotton may not even be a farm product since in order to be such, under § 9–109(3) it must be "in the possession of a debtor engaged in raising * * * or other farming operations." The Gin Co., not Hext individually, was in possession of the negotiable warehouse receipts evidencing the cotton and the gin was not engaged in farming operations.

purposes might thus be regarded as the alter ego of the Gin Co. From the point of view of the buyers, however, in light of the general trade practice of buyers in dealing with the gins as the owners of the cotton being marketed, we do not think that the buyers here can be regarded as buying from a person engaged in farming operations when they purchased cotton from the W. A. Hext and Sons Gin Co., Inc.

Similarly, Marshall and Harlingen, although not buyers, dealt in the ordinary course of their businesses with gin companies and not with individual farmers. To the extent that they were dealing with Hext personally here, they were dealing with him qua gin owner, and not qua farmer. Nevertheless, as will be seen, their liability for conversion depends upon whether or not the actual buyers of the cotton took subject to the security interest under Section 9–306 (2) or free of the security interest under 9–307(1).

Even though a cotton buyer purchases in the ordinary course of business from a gin, which is in the business of selling cotton (and not engaged in farming operations), the buyer would not ordinarily take free of a security interest in the cotton created by a farmer who had sold the cotton to the gin. Section 9–307(2) requires that in order for the buyer to purchase unencumbered by such a prior lien, the security interest in

question must have been *"created by his seller."* Thus, the fact that mortgaged cotton is sold by a farmer-debtor to a gin and then by the gin in the ordinary course of business to a buyer, does not, in the normal transaction, extinguish the security interest.[31] But in the instant case Hext, the farmer who created the security interest, was the sole owner of the Gin Co. which sold the cotton to the buyer, *and this state of affairs was known to the secured party at the time the security interest was created.*

■ We think this situation is directly analogous to one where a secured party takes a security interest in goods purchased by the debtor as consumer goods or equipment,[32] knowing the debtor to be in the business of selling goods of that kind, and the debtor then puts the goods in his inventory and sells them to a buyer in ordinary course. Professor Gilmore has suggested that in such a situation the buyer should take free of the security interest under the provisions of Section 9–307(1).[33] We agree. In the instant case, the FHA took a security interest in goods (the 578 bales of cotton) as farm products, knowing that the debtor had the capability of transferring them into the category of inventory and selling them in the ordinary course of his gin business. The buyers of the cotton thus took free of the security interest and could not themselves be sued by the Government for conversion.[34] This conclusion in turn

---

31. *See* National Shawmut Bank of Boston v. Jones, 108 N.H. 386, 236 A.2d 484 (1967).

32. Section 9–109 of the Code classifies goods into four mutually exclusive categories: Consumer Goods, Equipment, Farm Products, and Inventory. Only purchasers of certain types of inventory may take free of a security interest in the goods under § 9–307(1). Consumer Goods and Equipment are defined in part as goods for use, and thus cannot, while they remain in these categories, qualify as Inventory sold in ordinary course of business. Farm Products bought from a person engaged in farming operations are excluded from the effects of ordinary course buying by the express provision of

§ 9–307(1) itself. However, goods in other categories may become Inventory under certain circumstances. *See* G. Gilmore, 2 Security Interests in Personal Property § 26.8, at 699–700 (1965).

33. *Id.*

34. The same result would obtain under Article 7 of the Code if the transactions here be viewed as involving the purchase of negotiable documents of title (warehouse receipts) rather than the purchase of the cotton itself. See Uniform Commercial Code § 9–309. Article 7, in § 7–503(1), requires that the holder of a negotiable warehouse receipt obtains "no right in goods against a person who before issuance of the [receipt] had

determines the issue of whether Marshall and Harlingen who dealt with the cotton as intermediaries between the Gin Co. and the buyers can be liable for conversion.

Section 233(1) of the Restatement (Second) of Torts, cited to us by the Government as authority to be followed in determining the federal rule of conversion applicable to this case, provides:

\* \* \* one who as agent or servant of a third person disposes of a chattel *to one not entitled to its immediate possession* in consummation of a transaction negotiated by the agent or servant, is subject to liability for a conversion to another who, as against

\* \* \* a perfected security interest in them" unless the secured party either (a) entrusted the goods "to the bailor or his nominee with actual or apparent authoritly to \* \* \* store" them or with power of disposition under § 9–307; or (b) "acquiesced in the procurement by the bailor or his nominee of any document of title." Under this section it is clear that in the circumstances of the instant case the cotton was entrusted to the possession of Hext (the bailor) and that he had apparent authority to store the cotton with Harlingen. Further, as we have held *supra*, Hext had power of disposition of the cotton under § 9–307(1). As Professor Gilmore has pointed out:

The cross reference to § 9–307 [in § 7–503(1)] means \* \* \* that there is nothing a secured party can do to protect himself against the contingency of a fraudulently procured document with respect to collateral which is inventory held by a debtor for sale \* \* \*. (G. Gilmore, 2 Security Interests in Personal Property § 25.4, at 666 (1965).)

Finally, under § 7–503(1) (b) it is clear that the Government must in this case be found to have "acquiesced" in the procurement of the warehouse receipts by Hext. As Comment 1 to § 7–503 states:

A \* \* \* mortgagor [cannot] defeat any rights of a \* \* \* mortgagee which have been perfected under the local law merely by wrongfully shipping or storing a portion of the crop or other goods. However, "acquiescence" by the [mortgagee] does not require active consent under subsection (1) (b) and knowledge of the likelihood of storage or shipment with no objection or effort to control it is sufficient to defeat his rights as against one who takes by "due" negotiation of a negotiable document.

In the circumstances here, it simply could not be credibly maintained that the Government had no knowledge of the likelihood that the cotton would be stored after harvesting. For the reasons indicated above, under Article 7 the buyers of the negotiable warehouse receipts evidencing the cotton here in question clearly would be held entitled to possession of the cotton as against a prior secured party. For an indication that a contrary result would obtain if the warehouse receipts in question had been non-negotiable, *see* Funk, Trust Receipt vs. Warehouse Receipt—Which Prevails When They Cover the Same Goods, 19 Bus.Law. 627 (1964); *compare, Lofton v. Mooney,* 452 S.W.2d 617 (Ky.1970); *see generally* Annot., 21 A.L.R.2d 1339 (1968). Since the buyers here were entitled to immediate possession by virtue of the negotiation to them of the warehouse receipts, Marshall could not be liable as a converter for in good faith facilitating the transfer to them. See text, *infra.* However, the same reasoning would not necessarily apply to Harlingen who, after all, was the issuer of the negotiable warehouse receipts by virtue of which the buyers were entitled to priority over the Government's security interest. Nevertheless, Harlingen is otherwise protected from conversion liability by § 7–404 of the Code which provides:

A bailee who in good faith including observance of reasonable commercial standards has received goods and delivered or otherwise disposed of them according to the terms of the document of title or pursuant to this Article is not liable therefor. This rule applies even though the person from whom he received the goods had no authority to procure the document or to dispose of the goods and even though the person to whom he delivered the goods had no authority to receive them.

As the Comment to § 7–404 explains:

The section states explicitly what is perhaps an implication from the old acts that the common law rule of "innocent conversion" by unauthorized "intermeddling" with another's property is inapplicable to the operations of commercial carriers and warehousemen, who in good faith and with reasonable observance of commercial standards perform obligations which they have assumed and which generally they are under a legal compulsion to assume.

his principal or master, is entitled to the immediate possession of the chattel. (Emphasis supplied.)

Accepting this as an authoritative statement of the law (and none of the other authorities cited by the parties are to the contrary),[35] it is at once apparent that Harlingen and Marshall, to the extent they acted, in good faith and without actual knowledge of the Government's interest, as agents of the Gin Co. by facilitating the sale of the cotton to the buyers, cannot be liable as converters since the cotton was not transferred "to one not entitled to its immediate possesion." Rather, since the buyers took free of the Government's security interest under Section 9–307(1) of the Code, they were entitled to immediate possession, and the acts of Harlingen and Marshall in facilitating the transfer to them were thus not tortious. The Government thus has no valid claim against appellants Harlingen and Marshall. The judgment of the District Court must therefore be

Reversed.

35. For example, the Government quotes Dean Prosser's statement that "[p]erhaps the most common way in which conversion is committed is by an unauthorized transfer or disposal of possession of goods *to one who is not entitled to them.*" W. Prosser, Torts, § 15, at 87–88 (3d ed. 1964) (emphasis added).