UNITED STATES of America, Plaintiff,

v.

CONTINENTAL GRAIN COMPANY, Defendant.

No. 87–C–656–C.

United States District Court, W.D. Wisconsin.

Aug. 8, 1988.

David C. Sarnacki, Asst. U.S. Atty., Madison, Wis., for plaintiff.

Howard A. Pollack, Charne, Glassner, Tehan, Clancy & Taitelman, S.C., Milwaukee, Wis., for defendant.

## ORDER

CRABB, Chief Judge.

In this civil action for money damages plaintiff contends that defendant converted wheat on which Farmers Home Administration (FmHA) had a perfected security interest. Jurisdiction is present under 28 U.S.C. § 1345. The case is before the court on plaintiff's motion for partial summary judgment.

Because I find as a matter of law that, at the time of the grain sale at issue, defendant was a buyer in the ordinary course of business, defendant bought inventory from two farmers acting as a grain dealer not engaged in farming operations, and FmHA's security interest in the grain sold to defendant was created by a partnership including those same two farmers acting as defendant's seller, I will deny plaintiff's motion as to defendant's liability, and I will grant summary judgment to defendant.

Based on the parties' proposed findings and for purposes only of deciding this motion, I find that there is no genuine issue as to the following material facts.[1]

### Undisputed Facts

Plaintiff is the United States of America. Defendant Continental Grain Company is a business corporation organized in the State

---

1. The parties have adopted by stipulation plaintiff's nineteen proposed findings of fact and thirty of defendant's thirty-five proposed findings of fact. Plaintiff has not objected to the five remaining findings of fact proposed and properly supported by defendant.

of Delaware and registered and doing business in the State of Wisconsin. Defendant is and was in 1981 in the business of buying and selling grain.

Karlstad Equipment and Farms, also known as Klondike Farms, was a partnership engaged in farming operations that consisted in 1981 of Emmett Erpelding, Maynard Mogler, Dennis Messner and William Messner.

Messner Grain and Feed was a partnership engaged in the business of buying and selling grain that consisted in 1981 of Dennis Messner and William Messner. Messner Grain was licensed by the State of Minnesota as a grain dealer from at least 1976 through 1981.

Karlstad Equipment obtained two loans from FmHA in May 1981 totalling $1,328,-610.00. These two loans were secured by a security agreement. The security for these two loans consisted of the 1981 wheat crop grown on real estate described in the security agreement.

A UCC financing statement for Karlstad Equipment was filed with the County Recorder for Kittson County, Minnesota, on June 2, 1981. The filing of this financing statement served to perfect FmHA's security interest in the 1981 wheat crop grown on the real estate described in the security agreement.

Subsequent to the filing of the UCC financing statement on June 2, 1981, Karlstad Equipment sold Messner Grain a portion of its 1981 wheat crop, which was grown on the real estate described in the security agreement between Karlstad Equipment and FmHA.

From at least 1976 through 1981, on numerous occasions Messner Grain sold grain in the ordinary course of its business to defendant, which purchased the grain in the ordinary course of its business. Defendant customarily dealt with Messner Grain on a "forward contract" basis; that is, defendant would purchase an agreed quantity of grain on a particular day from Messner Grain at an agreed price for delivery and payment during a specified future time period.

Defendant purchased grain from Messner Grain under more than 250 forward contracts providing for delivery in 1980 and 1981. Forty-seven of these contracts provided for delivery during August or September 1981. Seven of these contracts, numbered 27257, 27260, 27270, 28621, 29457, 29513, and 29517, involve the wheat at issue in this lawsuit. Some of the wheat purchased by defendant in 1981 pursuant to these seven contracts was part of the 1981 wheat crop grown on the real estate described in the security agreement between Karlstad Equipment and FmHA.

Each of defendant's contracts with Messner Grain contained the following provisions: "Seller agrees that the commodity sold hereunder shall be delivered free and clear of all claims, liens, encumbrances and penalties" and "The parties do not contemplate nor require that seller obtain the commodity from any particular source."

The reverse side of the bank drafts by which defendant paid Messner Grain contained the following language above the space provided for the endorser's signature: "I/we understand that to sell mortgaged property and obtain payment therefor without disclosing the fact of such property being mortgaged is a criminal offense" and "I/we hereby represent that the merchandise for which this payment is requested was at the date of the sale hereof free from mortgage or other encumbrances."

On and after August 27, 1981 substantial quantities of wheat were delivered to defendant under the seven contracts enumerated above, and substantial payments were made to Messner Grain by defendant pursuant to those contracts. Messner Grain delivered the wheat purchased by defendant under contract numbers 27257, 27260, 27270, 28621 and 28457 to defendant at Superior, Wisconsin. A shipper hired by defendant transported the wheat purchased by defendant under contract numbers 29513 and 29517 from Messner Grain in Kittson County, Minnesota to one of defendant's grain elevators in Superior, Wisconsin.

At the time the seven contracts enumerated above were made and performed, defendant had no knowledge of Karlstad Equipment's existence, or that FmHA claimed a lien on at least some of the wheat Messner Grain delivered to defendant under those contracts.

On August 27, 1981, FmHA knew that wheat produced by Karlstad Equipment had been shipped and would be shipped to defendant. FmHA did not object to Karlstad Equipment when it learned that wheat produced by Karlstad Equipment was being shipped to Continental. FmHA did not contact defendant about its claim regarding the wheat Messner Grain sold defendant until October 1981, after defendant had already paid for the wheat.

FmHA did not give any express consent, either written or oral, to the sale of the 1981 wheat crop by Karlstad Equipment, to the purchase or subsequent resale of that wheat by Messner Grain, or to the purchase of any of that wheat by defendant.

The proceeds from the sale of Karlstad Equipment's 1981 wheat crop did not go to FmHA, and FmHA has never received any of the proceeds from the sale of that wheat.

At the time the seven contracts enumerated above were made and performed, Messner Grain was not engaged in farming operations.

At the time FmHA lent money to Karlstad Equipment in 1981 and took a security interest in Karlstad Equipment's 1981 wheat crop, FmHA knew that Messner Grain was in the business of marketing grain, that the owners of Messner Grain were Billy and Dennis Messner, that Billy and Dennis Messner were among the four owners of Karlstad Equipment, and that Billy Messner managed Messner Grain and that Karlstad Equipment intended that he would be responsible for marketing Karlstad Equipment's 1981 wheat crop through Messner Grain.

The loan to Karlstad Equipment from FmHA in 1981 was an unusually large farm loan for that particular geographic area.

At the time FmHA lent money to Karlstad Equipment in 1981 and took a security interest in Karlstad Equipment's 1981 wheat crop, FmHA had documents indicating that Karlstad Equipment was attempting to sell its farm land. FmHA does not usually lend money to persons attempting to sell their farms.

At the time FmHA lent money to Karlstad Equipment in 1981 and took a security interest in Karlstad Equipment's 1981 wheat crop, FmHA knew that Billy Messner, a partner of both Karlstad Equipment and Messner Grain, had a prior criminal conviction for misuse of government funds.

At the time FmHA lent money to Karlstad Equipment in 1981 and took a security interest in Karlstad Equipment's 1981 wheat crop, FmHA knew that certain of the partners of Karlstad Equipment had defaulted on a loan from a Production Credit Association in North Dakota; that bankers in North Dakota had questioned the integrity of the Karlstad Equipment partners; and that Messner Farms, a partnership of Billy and Dennis Messner, was in default on another FmHA loan.

At the time FmHA lent money to Karlstad Equipment in 1981 and took a security interest in Karlstad Equipment's 1981 wheat crop, FmHA had information indicating that Karlstad Equipment had falsely represented that an official of the Agricultural Stabilization and Conservation office had confirmed that the partners of Karlstad Equipment were the actual managers of the farm.

At the time FmHA lent money to Karlstad Equipment in 1981 and took a security interest in Karlstad Equipment's 1981 wheat crop, FmHA knew that substantial acreage represented by Karlstad Equipment in a loan application to be arable was, in fact, covered with trees, shrubs or rocks or was otherwise unarable.

FmHA loan procedures require that FmHA form a county committee of local farmers whose function is to aid FmHA in making loan decisions by evaluating a loan applicant's reliability, farming ability and eligibility.

At the time FmHA lent money to Karlstad Equipment in 1981 and took a security interest in Karlstad Equipment's 1981 wheat crop, the county committee for Kittson County had recommended that FmHA deny Karlstad Equipment's loan application; FmHA's county supervisor for Kittson County had recommended in very strong terms that FmHA deny Karlstad Equipment's loan application; the FmHA district director had recommended in very strong terms that Karlstad Equipment's loan application be denied; FmHA's Minnesota state director had recommended in very strong terms that Karlstad Equipment's loan application be denied.

State, district and county FmHA officials recommended that Karlstad Equipment's loan application be denied because they questioned the eligibility of Karlstad Equipment and because they did not consider the principals of Karlstad Equipment to be honest or sufficiently creditworthy.

### Opinion

■ This action for conversion of wheat offered as collateral for a FmHA loan is governed by federal common law, guided by principles of commercial law set forth in the Uniform Commercial Code. *United States v. Equity Livestock Auction Market,* 575 F.Supp. 1524, 1526–27 (E.D.Wis. 1983); *United States v. Hext,* 444 F.2d 804, 809–11 (5th Cir.1971).[2] Article 9 of the U.C.C. covers secured transactions such as the one at issue, and the overall intention of Article 9 is to protect secured creditors. *American Furniture Co., Inc. v. Extebank,* 676 F.Supp. 455, 457 (E.D.N.Y.1987) (citing *United States v. Handy and Harman,* 750 F.2d 777, 782 (9th Cir.1984). The general rule of Article 9 is that, in conflicts between two innocent parties, one being a

perfected secured creditor and the other being a subsequent buyer from the debtor, the perfected secured creditor is usually the winner. J. White & R. Summers, *Uniform Commercial Code* § 25–12, at 1065 (2d ed. 1980). However, there are some cases in which the buyer is the winner. *Id.*

The Uniform Commercial Code provides two exceptions to the basic rule that a security interest continues in collateral sold to third parties. *See* Lawrence, *The "Created by His Seller" Limitation of Section 9–307(1) of the U.C.C.: A Provision in Need of an Articulated Policy,* 60 Ind.L.J. 73, 77–78 (1984–85). The first exception occurs when the sale is authorized "by the secured party in the security agreement or otherwise." U.C.C. § 9–306(2). If the debtor is authorized to sell the goods free of the security interest, then the purchaser holds the goods free of the security interest, and the secured creditor's interest is cut off by his agreement.

■ Defendant contends as its first defense that FmHA agreed implicitly to the sale of the secured collateral by not objecting to its sale. Whether FmHA's conduct, including its failure to object to the debtor Karlstad Equipment's sale of the wheat in violation of the terms of the security agreement, constitutes a waiver of FmHA's right to require written consent to the sale, is a question of fact. *See Farmers State Bank v. Farmland Foods, Inc.,* 225 Neb. 1, 402 N.W.2d 277, 282 (1987). However, because there is a genuine issue as to this fact, relating to whether FmHA authorized the sale of wheat under U.C.C. § 9–306(2), I cannot decide the merits of this defense.

■ The second defense raised by defendant is a matter of law governed by the second exception to the basic rule that a

---

**2.** At least one court has interpreted the rule that federal common law applies to mean that where applicable federal regulations exist, the court must follow the federal regulations. *United States v. New Holland Sales Stable, Inc.,* 603 F.Supp. 1379, 1383 (E.D.Pa.1985). That court rejected the use of the U.C.C. and applied FmHA regulations to determine whether the lien at issue had been released. *Id.* However, the majority rule is to follow the U.C.C., because it represents the development by the states of a

uniform law governing commercial transactions regardless of the lender's identity. *United States v. Walter Dunlap & Sons, Inc.,* 800 F.2d 1232, 1239 (3rd Cir.1986) (quoting *United States v. Kimbell,* 440 U.S. 715, 732 n. 28, 99 S.Ct. 1448, 1460 n. 28, 59 L.Ed.2d 711 (1979). It would be "particularly disruptive to the stability of commercial law" to insist on a different law for the small segment of commerce consisting of transactions with the United States. *Id.*

security interest continues in collateral sold to third parties. This exception applies to certain unauthorized sales defined explicitly in U.C.C. § 9–307(1). U.C.C. § 9–307(1) provides:

A buyer in ordinary course of business (s. 1–201(9)) other than a person buying farm products from a person engaged in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.

The purpose of § 9–307(1) is to protect the buying public where the secured party finances inventory that is sold to the public by the debtor in the regular course of the debtor's business. *Aircraft Trading and Services v. Braniff, Inc.*, 819 F.2d 1227, 1232 (2nd Cir.1987) (citing White & Summers, *supra*, at 1067). However, the buyer loses this protection where the buyer purchases farm products from a person engaged in farming operations, or where the buyer's seller did not create the security interest in the goods sold.

Plaintiff contends that FmHA's security interest in the wheat grown on certain real estate owned by Karlstad Equipment continued through the time of sale of wheat to defendant, because it was not created by defendant's seller, Messner Grain. *See* U.C.C. § 9–307(1). Defendant counters that FmHA implicitly authorized the sale to defendant, and that for the purpose of determining whether the security interest was created by defendant's seller, Karlstad Equipment and Messner Grain must be considered together as the defendant's seller, because of the cross-ownership and close relationship between the two.

■ Under U.C.C. § 9–307(1), in order to take free of a security interest, three conditions must be satisfied: (1) the buyer must buy in the ordinary course of business, (2) the goods may not be farm products purchased from a person engaged in farming operations, and (3) the security interest must be created by the buyer's seller.

■ A "buyer in the ordinary course of business" is "a person who in good faith and without knowledge that the sale to him is in violation of the ownership rights or security interest of a third party in the goods buys in ordinary course from a person in the business of selling goods of that kind...." U.C.C. § 1–201(9). In this case defendant was a buyer in the ordinary course of business of the wheat at issue: it had no knowledge of FmHA's lien in the Karlstad Equipment wheat and Messner Grain was in the business of selling grain.

The second condition imposed by U.C.C. § 9–307(1) on a buyer of goods subject to a lien is known as the farm products exception. This exception was and continues to be supported by agricultural lenders seeking protection against the uncertainty of using future crops and other farm products as collateral. Uchtmann, Bauer and Dudek, *The UCC Farm Products Exception —A Time to Change*, 69 Minn.L.Rev. 1315, 1323 (1984–85) [hereinafter cited as Uchtmann]; Skilton, *Buyer in Ordinary Course of Business Under Article 9 of the Uniform Commercial Code (And Related Matters)*, 1974 Wis.L.Rev. 1, 64.

The farm products exception was proposed because of the difficulty of monitoring farm products collateral effectively and was intended to increase lenders' willingness to lend to farmers and thereby assure the availability of credit of farmers. Uchtmann, *supra* at 1322, 1324. It was also premised on the assumption that buyers such as grain dealers and cattle brokers, were more sophisticated than farmers and better equipped to check lien records. *Id.* at 1324.

Fewer people believe now that either farmers or agricultural lenders are less financially and technologically sophisticated than other businesspeople and bankers. *Id.* at 1325. Moreover, buyers of farm products are likely to find a UCC lien search costly and impractical because of a complicated search process, inadequate recorded information, or industry pressure to buy and sell quickly. *Id.* at 1328–29. Consequently, and because of the problems and inequities caused by the farm products exception, at least nineteen states have amended U.C.C. § 9–307(1) to afford great-

er protection to buyers of farm products.[3] *Id.* at 1315.

In this case, I need not decide whether the farm products exception continues to be applicable to federal cases because it makes no difference to the outcome.

The farm products exception applies only to products "in the possession of a debtor engaged in raising, fattening, grazing, or other farming operations." U.C.C. § 9–109(3). Once the products leave the farmer and come into the possession of a person not engaged in farming operations, they are characterized as "inventory" rather than "farm products," and the exception no longer applies. U.C.C. § 9–109(4) comment to subsection (4); *United States v. Hext*, 444 F.2d 804, 813–814 (5th Cir.1971); Skilton, *supra* at 63; *see also United States v. Progressive Farmers Marketing Agency*, 788 F.2d 1327, 1329 (8th Cir.1986) (hogs in hands of commission merchant were inventory and not farm products; commission merchant not liable for conversion).

■ In the instant case the grain defendant bought was in possession of Messner Grain, a grain dealer. Because Messner Grain held the wheat for sale and did not engage in farming operations, the wheat is properly defined as "inventory" under U.C.C. § 9–109(4). Because defendant purchased wheat from a grain dealer rather than from a person engaged in farming operations, the "farm products exception" of U.C.C. § 9–307(1) does not apply, and defendant satisfies the second condition.

■ The critical point on which the parties disagree is how the third condition, the "created by the seller" provision of U.C.C. § 9–307(1) applies to the facts of this case. This point is a difficult one, particularly because the purpose of the condition is not obvious. Lawrence, *supra* at 73–74, nn. 1–6. One commentator has suggested that the policy behind this limitation is the actual or apparent authorization of the secured party for the sale of the collateral. *Id.* at 83, 87, 111. In other words, when a lender to a dealer takes the dealer's inventory as collateral but leaves it in the hands of the dealer, the lender expects the dealer to sell that inventory and so gives implicit authorization to such sales.[4]

Other courts have acknowledged this policy rationale in cases where the elements of identity between the farmer and dealer are such that the secured party knows that the debtor farmer will sell the secured farm products as inventory in the guise of dealer. In these cases the secured party can be said to have created the appearance of authority to sell by the farmer-dealer. *See First Bank of North Dakota (N.A.) v. Pillsbury Co.*, 801 F.2d 1036 (8th Cir.1986); *United States v. Hext*, 444 F.2d 804 (1971).[5] In these situations, then, fairness requires

---

**3.** Wisconsin is not one of these states. Minnesota, as of 1985, requires lenders to give notice to registered farm buyers of security interests in crops or livestock. Registered farm products buyers take free of prior perfected security interests unless notified by the lender of its interest. Uchtmann, *supra* at 1342, n. 127.

**4.** The policy, then, is essentially the same as that behind U.C.C. § 9–306(2). In both provisions it is the existence or absence of authorization to sell, either explicit or implicit, that determines whether the buyer takes free of the lender's secured interest in the sold collateral. However, unlike the situation in U.C.C. § 9–306(2) where authorization acts to cut off the security interest, in U.C.C. § 9–307(1) situations the risk may in some cases be moved downstream to subsequent purchasers.

**5.** Plaintiff relies on *Garden City Production Credit Ass'n. v. Lannan*, 186 Neb. 668, 186 N.W. 2d 99 (1971), to show that U.C.C. § 9–307(1)

mandates that the security interest continues through the sale of the grain to defendant. However, this case involves the ordinary situation more typically covered by U.C.C. § 9–307(1), in which the farmer and dealer are completely separate entities, and so is not as helpful as the two cases cited in the text. *See Garden City*, 186 N.W.2d at 101. In the ordinary situation, the independent dealer has both the ability and motivation to check liens on the farm products it buys or takes on commission, because the dealer 1) knows the source and 2) may be subject to charges of conversion. In the unusual situation such as that before the court, where there is common ownership of the farming and dealing enterprises, there is no incentive to check the liens and thereby protect both the dealer and subsequent buyers from conversion actions.

placing the risk on the lender rather than on the buyer.

In *First Bank of North Dakota*, the bank lent money to two farmers, one of whom also owned a grain elevator. The farmers sold the elevator grain in which the bank had a lien, and the elevator sold some of the grain to Pillsbury Company. The court held that the lien was created in fact and law by Pillsbury's seller. *Id.* at 1040. The court reasoned that because one of the farmers owned the elevator, and because such joint ownership was known by the bank, the bank was in the best position to control the farmers' actions. *First Bank of North Dakota*, 801 F.2d at 1039–1040. The court concluded that " 'the relationship between the former owner [of the collateral] and the seller may be such that the security interest created by the former owner may be regarded as having been created by the seller....' " *Id.* at 1040 (quoting 9 *Anderson on the Uniform Commercial Code* § 9–307:8, at 194–95 (3d ed. 1981)).

In *Hext*, FmHA lent money to a cotton farmer who also owned a cotton ginning business. The farmer provided his forthcoming cotton crop as security for the loan. The farmer's cotton crop was ginned and marketed by the ginning company and sold to a third party. The court held that the buyer of the cotton took free of the security interest in the cotton. *Hext*, 444 F.2d at 814. The court reasoned that FmHA took a security interest in goods as farm products, knowing that the farmer had the capability of transferring them into inventory and selling them in the ordinary course of his gin business. *Id.* at 814. Therefore, the court concluded, the third party buyer should take free of the security interest under U.C.C. § 9–307(1). *Id.*

The facts in the case before the court are analogous to the facts in *First Bank of North Dakota* and *Hext*. FmHA knew of the joint ownership and of the transfer of the grain from Karlstad Equipment to Messner Grain. FmHA was in the best position to control the farmers' actions. As in the two cited cases, the debtor farmers in the instant case sold as inventory what they had grown; thus, they were the sellers that created the security interest in the grain that defendant bought under U.C.C. § 9–307(1). In sum, the relationship between Karlstad Equipment as the former owner of the collateral and Messner Grain as seller was such that the security interest created by Karlstad Equipment may be regarded as created by defendant's seller for the purposes of U.C.C. 9–307(1).

Because of the close identity and joint ownership between Karlstad Equipment and Messner Grain, and because of FmHA's knowledge of both this relationship and the transfer of grain between the two businesses, I conclude that, as a matter of law, defendant took the grain at issue free of FmHA's security interest in that grain.

"Even in the absence of a cross motion for summary judgment, judgment for the opposing party may be appropriate if the undisputed facts show that the non-moving party is entitled to judgment." *Bowman v. United States Board of Parole*, 411 F.Supp. 329, 330–331 (W.D.Wis.1976) (citing *Pitts v. Knowles*, 339 F.Supp. 1183, 1186 (W.D.Wis.1972)). In this case the undisputed facts show that defendant purchased the grain at issue free of FmHA's security interest in that grain, and so defendant is entitled to judgment. Defendant is not liable to FmHA for the price of the grain defendant purchased from Messner Grain in 1981.

### Order

IT IS ORDERED that plaintiff's motion for partial summary judgment is DENIED, and that summary judgment is GRANTED to defendant.