UNITED STATES of America

v.

**Ward LINDSEY, Jr., d/b/a Carson Livestock Commission Company and Scott B. Ralls.**

**Civ. A. No. CA 4–2419.**

United States District Court, N. D. Texas, Fort Worth Division.

Aug. 18, 1978.

**450**

Kenneth J. Mighell, U. S. Atty., Richard B. Vance, Asst. U. S. Atty., Fort Worth, Tex., for plaintiff.

John McBryde, McBryde & Bogle, Fort Worth, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

MAHON, District Judge.

This is a cattle conversion case brought by the government as lienholder to recover the value of cows sold by the mortgagor, Clyde R. Webb. Defendants, Scott B. Ralls and Ward Lindsey, Jr., d/b/a Carson Livestock Commission Company, handled the sale of the cattle for Webb. Defendants have filed a counterclaim under 28 U.S.C. § 2674. Trial was before the Court sitting without a jury.

1. PX # 4, paragraph III.B(6).

I.

### THE FACTS

Between 11 June 1968 and 8 July 1970, the United States made a series of three loans to Clyde R. Webb through the Farmers Home Administration [hereinafter "FmHA"]. These loan transactions were in the total principal amount of $38,500.00 and were evidenced by properly executed promissory notes. As collateral for payment of the indebtedness incurred by these three loans, Webb executed and delivered to the FmHA three security agreements that created a security interest in favor of plaintiff in Webb's dairy cattle and in specific farm implements. Plaintiff perfected its security interest by the filing of a financing statement executed by Webb and plaintiff and dated 1 August 1968.

The security agreements provided that Webb would "not abandon the collateral or encumber, conceal, remove, sell or otherwise dispose of it or of any interests therein, or permit others to do so, without the prior written consent of Secured Party."[1] Webb also agreed, however, to "comply with such farm and home management plans as may be agreed upon from time to time by Debtor and Secured Party."[2] Defendant's Exhibit # 5, Table D of the farm and home management plan, instructed Webb to regularly sell for slaughter those cows that were not producing milk at acceptable levels. These are called cull cows. Prior consent of the FmHA was not required, nor were any limits put on the number of cull cows a borrower could sell in a year; the borrower was to report sales only after they had been made. Additionally, there was no requirement that FmHA be included as joint payee of the proceeds. In Webb's agreement with the FmHA, he was to sell cull cows on his own initiative, and apply the proceeds either to his loan from the FmHA or for the purchase of replacement cows. FmHA policy is to rely on the integrity and honesty of the borrower in conducting the necessary culling.

2. PX # 4, paragraph III.B(2).

Over a period of time while Webb was still indebted to the FmHA, he sold approximately 110 head of cull cows at the Fort Worth Stockyards. Webb made arrangements for the sale of these cattle through the facilities of defendants Ralls and Lindsey. Webb had met Ralls while Ralls was associated with another firm, Fifer and Jery. After Ralls became associated with Carson Livestock Commission Company, Webb began making arrangements through that organization to handle the sales of his cattle.

There was an arrangement between Lindsey and Ralls that allowed Ralls to operate through Carson Livestock Commission. Lindsey, d/b/a Carson Livestock Commission Company, was registered as a market agency in livestock and had posted a bond in accordance with the Packers and Stockyards Act of 1921 and the regulations promulgated thereunder. Sometime prior to the events herein in question, Ralls had reached an agreement with Lindsey whereby Lindsey allowed Ralls to use the name, facilities and books, of Carson Livestock Commission Company to effect sales of livestock for Ralls's own customers. In return, Lindsey was to receive half of Ralls's commission on his sales. Under this agreement, Ralls undertook to make all the necessary arrangements for his own sales himself, and Ralls personally saw to the making of all accounting entries. Lindsey generally had no contact with Ralls's customers nor any particular knowledge of the transactions on which Ralls was working or of the cattle that Ralls sold.

Typically, the sales of Webb's cattle were handled in the following manner: Webb would deliver the cattle to the Fort Worth Stockyards himself. He would then fill out a waybill, listing Ralls as his agent to handle the sale. Webb would thereupon surrender possession of the cattle to an employee of the Fort Worth Stockyards, who would put them in a pen owned by the Stockyard but reserved for cattle to be sold by Carson Livestock Commission Company. Ralls would actually handle all the necessary arrangements for the sale such as setting the opening bid level and delivering the livestock to the auctioneer. The auctioneer, who was an employee of the Stockyards, would then make the sale to some third party. That third party would pay the purchase price into a custodial account handled by Carson Livestock Commission Company, which, after deducting expenses and commissions, would immediately forward the proceeds to the seller. Defendants were not connected in any way with either the purchasers or the Stockyard.

The total amount of commission received over a period of four years by Carson Livestock Commission Company for the sale of the cattle here in question was $186.45. Ralls and Lindsey each received approximately one-half of this amount. The value of the cattle allegedly converted and sought to be recovered by the government is $19,957.90.

Webb turned the proceeds of his first sale of cull cattle over to the FmHA. When he attempted to get it back to purchase replacement cattle, he was told that it had been applied to his note. Thereafter he made other sales of cull cattle. Some of which were handled by the defendants. Webb applied those proceeds to the purchase of replacement dairy cows and then notified FmHA of his actions. It is agreed that this is exactly what the FmHA expected and required Webb to do. FmHA did not expect or require that they be notified of any sale until the proceeds were applied. Sometimes this was weeks or even months after the actual sale.

Eventually, however, Webb began leasing dairy cows from Dairy Cows, Incorporated, with the proceeds from the sale of his cull cows. Webb's business folded sometime during September 1972 and he defaulted on his obligations to repay the promissory notes. A default judgment against Webb was entered on 25 April 1975. FmHA now seeks to recover from defendants the value of the cattle they allege Webb improperly sold.

## II.

## PRELIMINARY DISCUSSION

As in all FmHA conversion cases, the Court is primarily guided by *United States*

*v. Hext,* 444 F.2d 804 (5th Cir. 1971). In *Hext,* the Fifth Circuit decided that, for reasons of uniform federal interpretation, federal common law and not state law must govern security interests that arise from loan transactions made by the FmHA, and that the federal law is to be guided by the principles of Article 9 and other relevant portions of the Uniform Commercial Code [hereinafter UCC]. 444 F.2d at 807–811. The Fifth Circuit then noted the logical sequence in which federal conversion cases are to be decided:

(1) "it is necessary first to determine whether a valid Code security interest existed;"

(2) it is then necessary to determine "whether a default giving rise to a right of immediate possession has occurred;" and,

(3) finally, "issues respecting the law of conversion need be" decided. 444 F.2d at 811 n. 21. The issues of conversion, like the questions arising under construction of the Code, are to be decided by reference to general federal common law. *Id.* The *Hext* Court was quick to note, however, that the application of federal law does not mean that the federal government should always win, but rather that federal rights should not be at the mercy of any particular state court or legislature to change the applicable law. 444 F.2d at 810 n. 18.

In the present case, there is no contention that the security interest in question was not properly perfected under the UCC as applied in Texas, and the Court concludes from the uncontested copies of documents submitted that the security interest here in question was perfected.

Similarly, there is no dispute to the fact that Webb has defaulted on the security agreements he had with plaintiff. Lindsey and Ralls do contest, however, whether such default gives rise to the right of immediate possession on the part of the United States. The issue defendants raise is whether plaintiff consented to Webb's sales of cattle, thereby extinguishing its security interest in the cattle upon their sale.

Lindsey and Ralls also dispute the final step in the logical analysis of liability— whether they are liable to plaintiff under general common law principles of conversion.

## III.

### THE SECURITY INTEREST

Under the UCC, the cattle here in question would be classified as "farm products."[3] The Code provides protection against continuing security interests to all buyers in the ordinary course of business except buyers of farm products.[4] Under the Code, the only possible bar to a continuing security interest in farm products would be authorization by the secured party to disposition of the collateral. The Code provides, in § 9-306(2):

Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

The authority of an FmHA County Supervisor to consent to any disposition of property in which the United States holds a security interest must be found in the regulations granting him that authority. *United States v. Moreland,* 524 F.2d 548 (5th

---

3. UCC § 9–109 provides in relevant part:

Goods are . . . (3) "farm products" if they are crops or livestock or supplies used or produced in farming operations or if they are products of crops or livestock in their unmanufactured states . . . , and if they are in the possession of a debtor engaged in raising, fattening, grazing or other farming operations. If goods are farm products they are neither equipment nor inventory[.]

4. UCC § 9–307(1) provides:

A buyer in ordinary course of business . . . other than a person buying farm products from a person engaging in farming operations takes free of a security interest created by his seller even though the security interest is perfected and even though the buyer knows of its existence.

Cir. 1975); *United States v. E. W. Savage & Son, Inc.*, 475 F.2d 305 (8th Cir. 1973); *Cassidy Commission Co. v. United States*, 387 F.2d 875 (10th Cir. 1967). *See Federal Land Bank v. Board of County Commissioners*, 368 U.S. 146, 82 S.Ct. 282, 7 L.Ed.2d 199 (1961).

Under the regulations in effect at the time of the sales of cattle here in question, Webb's cattle would be classified as "basic security."[5] The authority to release basic security for FmHA loans was set forth in 7 C.F.R. § 1871.5(a) (1967):[6]

. . . County Supervisors are authorized hereby to release basic security when the property has been sold or exchanged for its fair market value, and the proceeds are used for one or more of the following purposes;

(1) To pay on the debts owed to the Farmers Home Administration which are secured by liens on the property sold.

(2) To purchase from the proceeds of the sale, or to acquire through exchange, property more suitable to the borrower's needs, subject to the following conditions: The new property, together with any proceeds applied to the indebtedness, will have security value to the Farmers Home Administration at least equal to that of the lien formerly held by the Farmers Home Administration on the old property. The new property must be made subject to a lien in favor of the Farmers Home Administration. . . .

(3) To make payments to other creditors having liens on the property sold which are superior to the liens of the Farmers Home Administration. . . .

(4) To pay costs required to preserve or realize on security property because of an emergency or catastrophe. . . .

*United States v. Moreland, supra*, is explicit in its holding that a county supervisor cannot authorize the extinguishment of an FmHA lien by consenting to a sale of the collateral except as provided in 7 C.F.R. § 1871.5 (1967).[7] It is also clear that Webb's sales of basic security cattle and subsequent investments of the proceeds in lease-purchase cattle were outside the scope of the release authority set forth in that regulation. The lease-purchase cattle were obviously of little or no security value to the FmHA.

Even assuming *arguendo* that local FmHA officials did intend to waive the FmHA's security interest in the cattle sold by Webb, such action would have been contrary to the published regulation granting authority to the local officials and would not be binding on the United States. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947); *United States v. Moreland, supra*, at 549; *E. W. Savage & Son, supra*, at 308.

The United States, therefore, cannot be said to have "authorized" the relinquishment of its lien by the sale of Webb's cattle under UCC § 9–306(2) merely by the acts of its agents. Accordingly, the security interest in the cattle continued under the Code into the hands of the purchaser, and the United States was entitled to immediate possession on default.

## IV.

### CONVERSION

Having determined that a valid security interest existed and that there was a default by Webb giving rise to a right of immediate possession, it remains to be decided whether the defendants are liable for conversion. *United States v. Hext, supra* at 811 n. 21.

---

**5.** 7 C.F.R. § 1871.5 (1967) effective during the period encompassing the sales here in issue and substantially similar to 7 C.F.R. § 1871.8 (1977), provides in relevant part:

(a) Basic security consists of all equipment serving as security for Farmers Home Administration loans. It also consists of all foundation herds and flocks, including replacements, which serve as a basis for the farming operation outlined in the Farm and Home Plan. . . .

**6.** Renumbered 7 C.F.R. § 1871.8 (1977).

**7.** *See* note 6 *supra*.

### A.

Although it has been said that conversion almost defies definition[8] the Restatement (Second) of Torts § 222A says conversion is "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." The Fifth Circuit has accepted[9] Restatement (Second) Torts § 233(1) as the authoritative law of conversion in cases concerning sales agents and commissionmen:

> . . . one who as agent or servant of a third person disposes of a chattel to one not entitled to its immediate possession in consummation of a transaction negotiated by the agent or servant, is subject to liability for a conversion to another who, as against his principal or master, is entitled to the immediate possession of the chattel.

FmHA argues that defendants Ralls and Lindsey assisted Webb in converting the cattle and, therefore, are as liable as he for the government's lost equity. FmHA correctly points out that while it is undisputed that defendants acted in good faith and in the honest belief that what they did was proper, the majority rule is that this is no defense to a conversion case. *See* Annot., 96 A.L.R.2d 208 (1964).

### B.

■ This Court is of the opinion, however, that the particular facts in this case preclude blind adherence to the line of cases cited by the government. *See United States v. E. W. Savage & Sons, Inc.,* 343 F.Supp. 123 (S.D.S.D.1972), *affirmed,* 475 F.2d 305 (8th Cir. 1973); *Duvall-Wheeler Livestock Barn v. United States,* 415 F.2d 226 (5th Cir. 1969); *United States v. Carson,* 372 F.2d 429 (6th Cir. 1967); *United States v. Sommerville,* 324 F.2d 712 (3rd Cir. 1964); *United States v. Topeka Livestock Auctions, Inc.,* 392 F.Supp. 944 (N.D. Ind.1975); *United States v. Bankers Livestock Commission, Inc.,* (D.N.M.1977).

In all these cases, the debtor's sale of collateral was itself an act in violation of the security agreement, and that act constituted the conversion. In the instant case, however, this Court believes that Webb's sale of the cattle through the defendants was not in violation of the security agreement. The farm and home management plan, incorporated into the security agreement by reference, required Webb to sell cull cattle as the need arose.[10] The act of selling the cattle was not, therefore, inconsistent with FmHA's rights. The conversion took place later when Webb failed to properly apply the proceeds either to reduce his indebtedness or to purchase replacement cattle.

### C.

Additionally, most of the above cases explicitly state that there was no express consent to make the sale. This Court concludes that in the instant case, however, FmHA did expressly and in writing authorize the sale of cull cattle by Webb by requiring him to comply with the farm and home management plan.

■ It is essential to point out that while FmHA can and did authorize the sale of cull cows, such sales did not extinguish FmHA's lien. The regulations severely limit a county supervisor's authority to release a lien. *United States v. Moreland, supra.* But this Court feels it is entirely within a county supervisor's authority to consent to a sale which does not extinguish the lien.[11] Such consent, as was given in this case, precludes holding the commissionmen liable

---

8. Prosser, *Torts* § 15 (4th ed. 1971).

9. *United States v. Hext, supra* at 815.

10. There is no evidence that any of the livestock sold through defendants Ralls and Lindsey were not in fact culls.

11. This is implicit in the admonition in 7 C.F.R. § 1871.5 (1967) that borrowers "will be held strictly accountable to FmHA for the proper use of proceeds from the sale of security property." [renumbered 7 C.F.R. § 1871.8 (1977)].

for conversion [12] if it was within the county supervisor's authority to make that consent. This Court feels that the county supervisor had that authority.

Although the applicable FmHA regulations have been revised from time to time, the theme that runs throughout all pertinent versions is that the FmHA county supervisor has broad authority to make agreements with a borrower in order to insure that proper farm practices are followed.

The county supervisor is responsible for seeing that all persons making inquiry about FmHA services are given information relative to the services. 7 C.F.R. § 1801.-1(a) (1967). The regulatory policies of FmHA are designed to "permit the exercise of wide latitude in judgment by county supervisors" in making an analysis in the needs of a borrower in his operations. 7 C.F.R. § 1802.31(b) (1971). The county supervisor is authorized to "reach agreement" with borrowers with respect to resolution of problems related to his farm operations. In addition, he is to make necessary adjustments and improvements in the operations to assure that his supervisory efforts obtain the desired results. 7 C.F.R. § 1802.5 (1971). He has the authority, before a loan is made, to reach an understanding with the prospective borrower on "care and maintenance of security" and "accounting for security property" 7 C.F.R. § 1801.4(b)(10), (11) (1971). He is instructed that he "will establish for his County Office area by major farm enterprises, a list of key farm management practices essential for success" and that his planning will involve a "decision making process"; and, he is instructed that he will supplement the individual borrower's farm and home plan by reaching agreement on "key practices essential for success" and that these practices "should be agreed upon and documented in Table D of their farm and home plan" 7 C.F.R. §§ 1802.13(a) (1971), 1802.14(a)(1), (4) (1971). One of the practices he is authorized to

recommend to a borrower is the culling of livestock 7 C.F.R. § 1802.14(d)(2)(iii)(b) (1971).

Mr. Webb was instructed by Table D [13] of his farm and home plan to dispose of his non-productive cows (cull cows). This was a practice determined by the county supervisor to be essential to the success of Mr. Webb's dairy operation. Thus, in selling the cull cattle, Mr. Webb was doing exactly what the county supervisor instructed him to do. In giving the instructions, the county supervisor was doing exactly what the regulations required. He was making an agreement with the borrower that the latter would take such steps as might be necessary to cause his operation to be a profitable one. The agreement in this case was that the borrower would sell his cull cows whenever he determined that they should be sold. The understanding, express and implied, between the county supervisor and Mr. Webb was that Mr. Webb had general authority to sell cull cattle and that he would be the one responsible for accounting for the proceeds of sale. This understanding came directly within the scope of the county supervisors' authority.

The Court finds that Mr. Webb had authority from FmHA at all pertinent times to sell cull cattle; to use his discretion to determine which cattle to sell as culls, when to sell them, and where to sell them; to make sales of cull cattle without giving prior notification to FmHA of his intent to do so; and to receive payment of the sales proceeds, less expenses of sale, by check or draft on which only his name appeared as a payee. The plaintiff did not challenge the testimony of Mr. Webb that all cattle in dispute were cull cattle.

### D.

Our facts can best be understood by looking at each step chronologically: (1) Webb received the loans and bought dairy cattle.

---

**12.** "In order to constitute conversion, nonconsent to the possession and disposition of the property by defendant is indispensable." 89 C.J.S. *Trover & Conversion* § 5 (1955).

**13.** DX # 5.

A financing statement was filed. (2) Webb sold some cull cattle through defendants. The proceeds were paid directly to Webb who gave the money to FmHA which then applied the proceeds to his note. FmHA was not notified of the sale until after Webb had received the proceeds. They had no objection to any portion of this transaction, however, and in fact, it was handled exactly as they required it to be. (3) Webb took other cull cows to defendants to be sold. Hypothesizing for a moment, let it be assumed that defendants knew of Webb's security agreement with FmHA.[14] Assume further that they called FmHA to make sure that the sale was proper. FmHA concedes that they would have told them to go ahead with the sale. Likewise, if FmHA had been asked whether they required their name to be listed as co-payee on the proceeds check they would have answered no. (4) Defendants sold Webb's cattle and gave him the proceeds less their commission. At this point in time there was still nothing wrong with the transaction so far as FmHA was concerned. This is true even if FmHA was unaware any sale had already taken place since it is admitted they did not expect or require notification until a reasonable time after the sale. (5) Sometime later Webb used the proceeds to rent dairy cows. *This* action is the breach of the security agreement, and it is at *this* point the conversion takes place. It was not until this moment that Webb was in default, giving FmHA a right to immediate possession. Defendants Ralls and Lindsey had no part in the misapplication of the proceeds and this Court does not feel they can be held liable for conversion. The actions taken by defendants were exactly the same in the first sale, about which FmHA has no objection, and the later sales, for which FmHA seek to hold them liable.

■ Essential to liability for conversion is an exercise of dominion and control in-

consistent with the rights of the true owner. Prosser, *Torts* § 15 (4th ed. 1971). Nothing inconsistent with FmHA's rights was done by anyone until Webb misapplied the proceeds after defendants were entirely removed from the picture.[15]

### E.

In the typical case in which the auctioneer or commissionman is held liable, he is said to be put on constructive notice by the filed financing statement that a sale of the cattle would be in breach of the security agreement. He should not, therefore, participate in any sale without either checking with the lienholder or making sure the lienholder had given prior written consent to the sale. But in our case, the FmHA wanted Webb to sell some of the collateral. In fact, the farm and home management plan required Webb to sell culls. This constitutes prior written consent as required by the security agreement. Webb's act of selling cattle was neither a default nor a conversion.

■ It is clear that if the FmHA gave no prior written consent to the sale, the sale was both a breach of the security agreement and a conversion and, therefore, defendants are as liable as Webb. The government contends that *United States v. Moreland, supra* holds that FmHA is without authority to consent to any sale until after the proceeds are correctly applied.

The government's position distilled down is that every sale is a technical breach of the security agreement and a technical conversion. If, however, everything goes smoothly and the proceeds are applied correctly, then and only then will FmHA magnanimously grant its ex post facto consent. They argue this position is supported by *United States v. Moreland, supra.* This Court believes, however, that the *Moreland* analysis should not be applied in cases such

---

**14.** It is undisputed that they had no actual knowledge.

**15.** Since FmHA's lien covered the cows and their proceeds, defendants' help in the sale did nothing to alter the value of FmHA's security.

In a sense defendants may be said to have done nothing more than accept the cows and then "redeliver" to Webb. That would exonerate them from liability. *See* Restatement (Second) Torts § 235.

as this where (1) sale of collateral is recognized by the FmHA to be an essential phase of the borrower's business and in fact is required by the security agreement and (2) the government's lien is not extinguished by the sale of the collateral. Equity requires that this exception for dairy operations be part of the federal common law of conversion. *United States v. Hext, supra* at 811 n. 21. It would be unconscionable to allow FmHA on the one hand to require a borrower to cull cattle or else be in violation of the security agreement and, at the same time, to call every sale a conversion with everyone connected potentially liable.

Nor will public policy support such a result. The FmHA does not need the additional protection of potential conversion defendants when their liens is not extinguished. If the borrower defaults and is judgment proof, the government can still enforce its lien either against the proceeds or the holder of the sold collateral.[16]

## V.

### DEFENDANTS' COUNTERCLAIM

■ Defendants attempt to hold FmHA liable for negligence in failing to conduct adequate inspections of the collateral and in failing to notify them of the government's lien. Defendants' argument is without merit. Although the regulations do refer to inspections by the county supervisors (7 C.F.R. § 1802.63(b)(4)(vi) (1977)) and furnishing lists of borrowers (7 C.F.R. § 1871.6 (1977)), there has been no showing that FmHA has any such duty toward defendants.

Judgment shall be entered accordingly.