UNITED STATES of America

v.

**NEW HOLLAND SALES STABLE, INC.**

UNITED STATES of America

v.

**VINTAGE SALES STABLE, INC.**

UNITED STATES of America

v.

**WALTER DUNLAP & SONS, INC.**

Civ. A. Nos. 83–6230 to 83–6232.

United States District Court,
E.D. Pennsylvania.

Dec. 19, 1985.

Stanley Weinberg, Asst. U.S. Atty., Philadelphia, Pa., for plaintiff.

James H. Thomas, Lancaster, Pa., for defendants.

## MEMORANDUM OPINION

HUYETT, District Judge.

The United States of America, acting on behalf of the Farmers Home Administration (FmHA), brought these three suits in conversion alleging that defendants converted a total of 236 head of cattle in which the FmHA held a perfected security interest. The 236 head of cattle were collateral for two FmHA loans which Mark and Cheryl Noll had received. Each defendant is a livestock commission merchant or livestock commission broker and each defendant handled the sale of some of the Nolls' cattle.

Approximately on August 31, 1979 and December 24, 1980, Mark and Cheryl Noll received the two loans from the FmHA in the respective amounts of $90,000.00 and $230,360.00. As security for each loan, the Nolls signed and executed a security agreement which granted the FmHA a security interest in all livestock, crops, farm and other equipment described therein together with all property of a like nature acquired thereafter. The FmHA form security agreement contained a clause requiring the FmHA's prior written consent before collateral was sold. The Nolls also executed a financing statement which the FmHA filed with the prothonotary of Lancaster County thereby perfecting its security interest in the Nolls' property.

Between the months of February and May 1981, the Nolls, with defendant New Holland acting as commission broker sold 97 head of cattle for total gross proceeds of $70,117.65. During the same period, the Nolls sold 68 head of cattle for a total of $46,780.16 with defendant Dunlap acting as commission broker and 71 head of cattle for $50,579.08 with defendant Vintage acting as commission broker. Also during this period, February through May 1981, the Nolls made five payments to FmHA, remitting a total of $155,000.00. At that time, however, the Nolls owed $259,000.00 and had received a total of $232,922.53 in gross proceeds from the sale of the cattle during this period. The remaining $77,-922.53 from the proceeds, the Nolls used as an operating credit to pay normal, routine farm expenses.

The proceeds from each sale handled by the defendants were paid directly to the Nolls after appropriate commissions were deducted. At no time did defendants have any knowledge of the security interests in the cattle being sold nor did they make any inquiries to that effect either to the Nolls, the FmHA, or the prothonotary's office in

Lancaster County. Defendants each issued a bill of lading when the cattle were delivered and then followed normal, routine practices in handling the sales of the cattle.

In August 1981, the FmHA Lancaster County supervisor, Patrick K. Freeman, learned that the Nolls would not be able to pay off the entire loan. At this time, Mr. Freeman completed a FmHA form entitled "Record of the Disposition of Security Property" (Freeman Dep.Ex. 13) which listed Nolls' sales through the defendants and noted that he, on August 10, 1981, had not approved of the sales or the use of the proceeds. Subsequently, the Nolls filed for bankruptcy. The government now contends that each of the defendants converted the Nolls' cattle by selling them and failing to remit their value to the government. Seeking damages from each defendant in the amount of the gross proceeds each defendant received, the government claims total damages of $167,476.89. The unpaid balance due on the Nolls' loans, however, is $106,962.85.

Presently before me are the parties' cross motions for summary judgment. Before the merits of these motions may be addressed, it is first necessary to determine whether liability in this case is governed by state or federal law. Defendants, in their joint memorandum in opposition to the government's motion for summary judgment, contend that under *United States v. Kimbell*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) the relevant state law applies to any actions brought by the FmHA for alleged violations of its security interest in livestock. Plaintiff, on the other hand, contends that federal law should govern.

Federal courts have consistently held that federal law provides the rule of decision in cases in which a genuine federal interest is at stake or in which a question involving the rights of the United States is presented. Applying federal law, the Court in *Clearfield Trust Co. v. United States*, 318 U.S. 363, 366, 63 S.Ct. 573, 574, 87 L.Ed. 838 (1943) emphasized that "the application of state law ... would subject the rights and duties of the United States to exceptional uncertainty. It would lead to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states."

■ Similarly, in *United States v. Kimbell Foods, Inc.*, 440 U.S. at 726–27, 99 S.Ct. at 1457–58 (1979), the Court held that in proceedings to recover on federal loan programs, including FmHA loans, federal common law would apply. *See also, United States v. Kennedy*, 738 F.2d 584 (3d Cir.1984); *United States v. Hext*, 444 F.2d 804 (5th Cir.1971); *United States v. Sommerville*, 324 F.2d 712 (3d Cir.1963); *United States v. Chesley's Sales, Inc.*, 523 F.Supp. 528 (W.D.Pa.1981). The Nolls' loans were granted pursuant to the Consolidated Farm and Rural Development Act. Because the security interest was obtained by the FmHA under an Act of Congress pursuant to a grant of constitutional authority, it is clear that the requisite federal interest is present. If disparate laws of individual states were applied to substantially identical loan transactions, the FmHA's ability to administer its large scale farm loan program would be seriously undermined. Therefore, federal law governs the issues raised in this case.

■ The more difficult question is the content of the federal law to be applied. Defendants, relying on *United States v. Kimbell*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979), contend that even if a uniform federal common law were to be applied, "it should be derived from the legal rules developed in similar secured transactions cases across the Nation." (Defendants' Brief in opposition at p. 8). Specifically, defendants contend that the Uniform Commercial Code should serve as the basis for federal common law in this area. *See United States v. Burnette-Carter Co.*, 575 F.2d 587 (6th Cir.), *cert. denied*, 439 U.S. 996, 99 S.Ct. 596, 58 L.Ed.2d 669 (1978); *United States v. Hext*, 444 F.2d 804 (5th Cir.1971).

In response, plaintiff notes that the *Kimbell* Court specifically recognized that state law would not be incorporated as the feder-

al common law if to do so "would frustrate specific objectives of the federal programs" or conflict with the need for national uniformity. *U.S.A. v. Kimbell, supra,* 440 U.S. at 728, 99 S.Ct. at 1458. Moreover, plaintiff contends, if clearly defined and applicable federal regulations or a general federal rule exist, the court has no choice but to follow the federal regulation or general rule. Plaintiff contends that there are federal regulations which are applicable in this case and which not only do not incorporate state law but also specify in detail what can and cannot be done with collateral and proceeds.

■ Plaintiff's analysis is correct. As the Third Circuit noted in *United States v. Kennedy,* 738 F.2d 584, 586 n. 3 (3d Cir. 1984), the *Kimbell* Court's primary concern was with formulating a federal rule in the absence of an existing federal rule. Once the *Kimbell* Court had decided that federal law governed and no federal rule existed, the court had a choice between formulating a general federal rule or adopting the state law. The *Kimbell* Court chose to incorporate state law. Where, however, a federal rule of law or regulation exists the court has no choice to make; the court must apply the federal rule. Therefore, the court in *United States v. Kennedy,* 738 F.2d 584 was obliged to apply the federal rule of conversion as it had been articulated in *United States v. Sommerville,* 324 F.2d 712.

What must be determined with respect to each issue raised by the parties in this case is whether an applicable federal rule or regulation exists. Federal Rule of Civil Procedure 56(c) states that summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. To prevail on a motion for summary judgment, the moving party must establish the absence of a genuine issue of material fact; all reasonable doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. *Joe Regueira, Inc. v. American Distilling Company,* 642 F.2d 826 (5th Cir.

1981). Each of the five separate and alternative arguments defendants have raised in support of their joint motion for summary judgment will now be examined.

Defendants contend first that the FmHA authorized the Nolls to sell the cattle collateral and to receive the proceeds in their name only. Pointing to the Farm and Home Plan and the Supplementary Payment Agreement, defendants contend that the FmHA gave the Nolls written consent to sell the cattle handled by the defendants. Alternatively, defendants contend that the conduct of Patrick Freeman, the Lancaster County FmHA supervisor, amounted to consent. Under pre-UCC case law and UCC § 9–306(2), defendants argue, consent of a secured party to a debtor's sale of collateral, even if the debtor is required to remit the proceeds for application to the loan, extinguishes or releases the lien on the collateral, regardless of the debtor's failure to apply the sale proceeds to his loan. Therefore, defendants argue, they did not convert the cattle and are not liable to plaintiff.

■ While defendants' argument may well be correct if the UCC were applied, as plaintiff notes, there are federal regulations which govern when FmHA loans are involved. Paragraph IV.E of the security agreement between the Nolls and the FmHA states that the agreement is subject to FmHA regulations. Sections 1962.17(a) & (b) and 1962.18(b) of Title 7 of the Code of Federal Regulations govern the release of liens held by the FmHA. Section 1962.-17 states in pertinent part:

§ 1962.17 Releasing chattel security.

Chattel security may be released only when release will not be to the financial detriment of FmHA. Borrowers will be strictly accountable to FmHA for the proper use of proceeds from the sale of security . . .

(a) *Basic security.* Basic security is all equipment (including fixtures in UCC States) and foundation herds and flocks securing FmHA loans *which serve as a*

*basis for the farming or other opera-tion outlined in Form FmHA 431-2, "Farm and Home Plan,"* Form FmHA 431-3, "Household Financial Statement and Budget," or Form FmHA 431-4, "Business Analysis Nonagricultural Enterprise," and replacement of such property... County Supervisors may release basic security when the property has been sold or exchanged for its present market value and the value of the borrower's remaining FmHA security, as determined by an appraisal, is substantially greater than the amount of the debt or when the property has been sold or exchanged *and* the proceeds are used for one or more of the following purposes:

(1) To apply to the debts owed to FmHA which are secured by liens on the property sold.

(2) To purchase from the proceeds of the sale, or to acquire through exchange, property more suitable to the borrower's needs...

(3) To make payments to other creditors having liens on the property sold which are superior to the liens of FmHA...

(4) To pay costs to preserve the security because of an emergency or catastrophe, when the need for funds cannot be met through an FmHA loan, or an FmHA loan cannot be made in time to prevent the borrower or FmHA from suffering a substantial loss.

(b) *Normal income security.* This is all security not considered basic security including crops, livestock, poultry, products, and other property covered by FmHA liens which are sold in operating the farm or other business. County Supervisors may release normal income security when the property has been sold or exchanged for its present market value and the proceeds are used for one or more of the following purposes:

(1) To pay debts owed to FmHA.

(2) To pay farm and home or other operating expenses provided for in tables of Form FmHA 431-2, Form FmHA 431-3, or Form FmHA 431-4....

7 C.F.R. 1962.17 (emphasis added).

 The distinction drawn between basic security and normal income security is important because the proceeds from the sale of normal income security can be used for many more purposes than proceeds from basic security, including farm operating expenses. Therefore, a determination must be made as to whether the 329 head of cattle, some of the sales for which defendants handled,[1] constituted basic or normal security. Both the Security Agreement and the Farm and Home Plan (D.App. 184; FmHA 431-2) listed 329 head of cattle as collateral for the FmHA loans. The 329 head of cattle "serve[d] as a basis for farming ... operation outlined in Form FmHA 431-2, 'Farm and Home Plan' ...., and replacement of such property," § 1962.-17(a) and therefore constituted basic security. Because the Nolls applied $77,922.53 of the proceeds from the sale of basic security to farm operating expenses and not to one of the four purposes permitted by § 1962.17(a), any action County Supervisor Freeman may have taken, if any, consenting to the sales does not constitute a release of the lien. Under § 1962.17(a) the proceeds must be used for one of the four purposes enumerated before a release can be effected.

Similarly, § 1962.18(b) of Title 7 states in part:

(b) *Accounting by borrower.* The borrower must account for all security and will be instructed regarding its care, maintenance, and disposition when a loan is made and as often afterward as necessary. When borrowers sell security, the sale will be made subject to the FmHA lien. The property and proceeds will remain subject to the lien until the lien is released or the sale is approved by the County Supervisor *and* the proceeds are

---

**1.** The FmHA held a security interest in a total of 329 head of cattle which the Nolls owned. Of the 329 head of cattle, the three defendants in this action handled the sales of 236 head.

used for one or more of the purposes stated in § 1962.17 . . .

(Emphasis added).

Release becomes effective when two events have occurred: 1) the sale is approved by the County Supervisor and 2) the proceeds are properly applied under § 1962.17(a). Therefore, even if Supervisor Freeman consented to the sales, such consent did not constitute approval of sales not subject to the security interest because the proceeds were not properly applied. Applying these same principles, the court in *United States v. E.W. Savage & Son, Inc.*, 475 F.2d 305 (8th Cir.1973), held that the County Supervisor had not released the government's liens when the proceeds were not properly applied even though the FmHA approved the sales transaction; the court therefore held the defendant livestock commission firms liable to the FmHA. The *Savage* court went on to hold that even if the local FmHA officials had waived the liens involved, such action would not have been binding on the government because it was contrary to the published regulation. *United States v. Savage*, 475 F.2d at 307. *See also United States v. Moreland*, 524 F.2d 548 (5th Cir.1975). Similarly, in this case, the lien remained in effect on both the collateral and the proceeds.

Relying on *United States v. Lindsey*, 455 F.Supp. 449 (N.D.Tex.1978), defendants contend that even if consent is not a defense, defendants still should not be held liable for conversion. Although the *Lindsey* court held that a FmHA security interest in cattle continued into the hands of the purchaser, the court held that defendants, livestock commissionmen, were not liable to the government for conversion because the act of conversion occurred at the time the debtor misapplied the proceeds of the sales defendants handled rather than at the time of the sale.

■ In his opinion, Judge Mahon noted that the FmHA had consented to the sales and that even though this consent did not amount to a release of the lien, the sale was not inconsistent with FmHA's rights because its consent had been given. *Id.* at

454. Because the debtor had done precisely what was required by the FmHA in selling the cattle and collecting the proceeds, the defendant brokers had not violated the security agreement. By so holding, the *Lindsey* court in effect ignored the existence of the lien which continued in the cattle as well as the proceeds and thereby undermined the policy behind § 1962.18(b). A FmHA lien continues in collateral at the time of sale to protect the secured party from exactly the sort of situation which transpired in this case, i.e. the misapplication of the proceeds. Section 1962.18(b) makes no exception for middlemen like the defendants, i.e. commission brokers, auctioneers, etc.

Moreover, the *Lindsey* court's holding is contrary to established Third Circuit law. In *United States v. Sommerville*, 324 F.2d 712 (3d Cir.1963), the court held that an auctioneer, by selling property in which the FmHA held a security interest, without the knowledge or consent of the FmHA, interfered with and converted the FmHA's right to the chattels and therefore had to be held strictly accountable. *See also United States v. Chesley's Sales, Inc.*, 523 F.Supp. 528 (W.D.Pa.1981). As the court in *United States v. Kennedy*, 738 F.2d 584, 586 n. 4, noted, the decision in *United States v. Sommerville*, did not turn on defendant's status as an auctioneer. "Instead, the court focused on the defendant's activities and status. Defendant's activities wrongfully interfering with the FmHA's interest in the collateral constituted a sufficient independent basis for imposing liability." *Id.* Here too, defendants interfered with the FmHA's lien on the cattle. Therefore, the analysis used by the *Lindsey* court which defendants urge me to adopt here must be rejected.

■ Defendants further contend that they can not be held liable because they handled the sales as good faith agents for sale, with no knowledge of any violation of any security interest, to buyers in the ordinary course of business. In support of this contention, defendants rely upon *United States v. Hext*, 444 F.2d 804 (5th Cir.1971)

in which the court held that good faith brokers handling the sale of agricultural commodities qualifying as "inventory" under the UCC to buyers in the ordinary course of business can not be held liable for conversion. Citing UCC § 9–307(1) which states that "(a) buyer in the ordinary course of business, other than a person buying farm products from a person engaged in farming operations, takes free of a security interest created by his seller...," the *Hext* court concluded that the defendant broker and warehouseman dealt in the ordinary course of their businesses with cotton gins and not with the individual farmers, i.e. with Hext—the Gin Co. not Hext—the farmer.[2] In this case, defendants clearly dealt with the Nolls in their capacity as farmers. Moreover, the *Hext* court held that the ultimate buyers took free of the government's security interest because they bought inventory not farm products; Hext—the farmer had transferred his cotton to Hext—the Gin Co. Essential to the court's holding was the finding that Farmer Hext's cotton, once transferred to the Gin Co., lost its individual identity and became part of the Gin Co.'s inventory. Because defendants, a broker and a warehouseman, acted in good faith and without knowledge of the government's interests, as agents of the Gin Co., by facilitating the sale of the cotton to the buyers, they could not be held liable for conversion because the cotton was not sold "to one not entitled to its immediate possession." *Hext*, at 816.

In this case, however, the buyers to whom the Nolls' cattle were transferred did not take free of the government's security interest. Under the federal regulations, 7 C.F.R. § 1962.17(a) and § 1962(b), the lien on the cattle was not released. Furthermore, the cattle were always identifiable as belonging to the Nolls and were always farm products. Defendants were merely acting as the agents of the Nolls who engaged in farming operations. Therefore, under U.C.C. § 9–307(1), the buyers in effect bought farm products from a person engaged in farming operations and did not take free of the security interest created by the Nolls.

■ Relying upon the U.C.C. and § 7–404 in particular, defendants also argue that they are entitled to immunity from liability because they were bailees who acted in good faith in holding the cattle for sale.[3] Defendants note that for all the cattle they received, they issued appropriate bills of lading, and these bills of lading qualify as documents of title as defined by U.C.C. § 1–201.

Defendant's argument, however, is merely another attempt to evade the effect of sections 1962.17(a) and 1962.18(b) of Title 7 of the code of federal regulations. Federal law governs this action and these regulations define the rule of decision to be applied. These regulations make no exception for auctioneers, cattle brokers, bailees, or the like. Therefore, defendants' argument must fail.

■ Furthermore, it is not clear that U.C.C. § 7–404 would provide defendants with the protection they seek. Section 7–

---

**2.** Hext, a cotton farmer, had received a FmHA loan which was secured by a chattel mortgage on his forthcoming cotton crop. Hext was both the farmer-debtor and the principal of the Gin Co., a cotton gin operation which served a number of farmers. The Hext court distinguished between these two functions Hext served when determining whether defendants dealt with a person engaged in farming operations. However, the court considered Hext—the farmer and Hext—the Gin Co. as one and the same when determining whether a buyer bought free of a security interest "created by his seller;" the court concluded that a person who bought from Gin Co. took free of the security interest because the security interest in question was created by his seller, i.e. Hext.

**3.** Section 7–404 states:

A bailee who in good faith including observance of reasonable commercial standards has received goods and delivered or otherwise disposed of them according to the terms of the document of title or pursuant to this division is not liable therefor. This rule applies even though the person from whom he received the goods had no authority to procure the document or to dispose of the goods and even though the person to whom he delivered the goods had no authority to receive them.

404 states that the bailee must act in good faith including observance of reasonable commercial standards. Defendants, however, never conducted a lien search or even contacted the County Supervisor Freeman to determine the status of the cattle sold despite the fact the Nolls' name was on a list circulated by the FmHA. Defendants rely upon Freeman's statement at his deposition to the effect that he would have authorized the sale if they had called. Section 1962.18(b) however states in part:

> ... Purchasers of security who inquire should be informed that the property is subject to FmHA's lien and will remain subject to it until they deliver any proceeds in cash to the County Supervisor or make checks payable jointly to the borrower and FmHA and the check has cleared. Form FmHA 462–2, "Written Consent to Sell and Statement of Conditions on Which Lien Will be Released," will be used by the County Supervisor to give written consent to sell when borrowers or purchasers request such a statement before the date of sale.

This provision should apply equally to middlemen who handle sales as did defendants in this case. Defendants can be held to the standards of the federal regulations and can not absolve themselves from liability by compliance with the Packers and Stockyards Act. "The Packers and Stockyards Act does not absolve the [defendant] from liability to the [government] for the reasonable market value of the sold livestock, even though the [defendant] had no knowledge of the [government's] chattel mortgage on such livestock. *United States v. Matthews*, 244 F.2d 626, 631 (9th Cir.1957).

Finally, defendants contend that the government cannot meet its burden of proof to show that it suffered an injury from the sales in question, that such proof is an essential element of an action for conversion, and that plaintiff's action must therefore be dismissed. Plaintiff, however, correctly notes that the essence of a suit for conversion is "an action for the wrongful taking of an interest in property." *United States v. Sommerville*, 324 F.2d at 713. Therefore, proof of the amount of damages is not an element of the tort of conversion.[4]

Each of the arguments defendants raise in support of their motion for summary judgment must be rejected. Moreover, plaintiff's motion for summary judgment as to whether the defendants committed the tort of conversion must be granted. A broker who sells property on behalf of a principal such as the Nolls, who hold the property subject to a FmHA lien, is liable to the secured party, the FmHA, for conversion regardless of whether he had actual knowledge of the principal's lack of title or want of authority to sell.[5] In this case, the FmHA loaned money to the Nolls; the Nolls executed a security agreement which placed a lien on the basic security livestock supporting the loan. The Nolls also executed a financing statement which was filed in the proper Lancaster County office. At the time of the sales, the lien remained in effect on the livestock and the financing statement was still in effect and provided constructive notice that the Nolls' livestock was subject to the FmHA lien. Defendants earned a commission from the sale of the cattle and could have protected themselves from liability and resulting damages in this

---

**4.** The government seeks a judgment against each of the three defendants in the amount of the proceeds each received from the sales of the Nolls' cattle, i.e. a total of $167,476.89. Only $106,962.85 remained outstanding on the Nolls' debt at the time they declared bankruptcy. Moreover, plaintiff has settled with a fourth broker for $25,000. The Nolls remitted a total of $155,000, and there is a dispute between the parties as to whether this came from the proceeds on the cattle or from some other source. If the $155,000 came from the cattle proceeds, only $77,922.53 of the proceeds was diverted from the FmHA.

**5.** Restatement (Second) of Torts § 233(1) states:
> ... one who as agent or servant of a third person disposes of a chattel to one not entitled to its immediate possession in consummation of a transaction negotiated by the agent or servant, is subject to liability for conversion to another who, as against his principal or master, is entitled to the immediate possession of the chattel.

case. "No similar means are available to the taxpayers who support the federal fisc, nor to the United States when it makes loans to further national interest." *United States v. Sommerville*, 324 F.2d at 717.

## ORDER

NOW, December 19, 1984, upon consideration of parties' cross motions for summary judgment, memoranda of law submitted by the parties and for the reasons stated in the accompanying memorandum, IT IS ORDERED that

1. Defendants' motion for summary judgment is DENIED.

2. Plaintiff's motion for summary judgment is GRANTED.

3. Judgment is entered for the plaintiff and against each of the defendants.

4. The parties shall meet to draft a proposed order as to the appropriate damages due plaintiff. The parties shall submit to chambers (Room 12614) a proposed order within thirty (30) days.